### CALEB H. BUTTERWORTH v. D. EVERETT TODD ET AL.

Argued June 4, 1907—Decided June 8, 1908.

1. A complaint made by church members against another church member in accordance with the discipline of their church, if made believing the matters charged to be true, is qualifiedly privileged, and on a trial of the complainants for libeling the member so charged, the burden is upon the latter to prove that the complaint was induced by express malice.
2. The proof of express malice in this case was insufficient to support the verdict against the defendants.
3. A verdict of $8,000, if otherwise supportable, was excessive.

On rule upon plaintiff to show cause why a new trial should not be granted.

Before GUMMERE, CHIEF JUSTICE, and Justice REED.

For the plaintiff, *Messrs. George M. Bacon, Ralph W. E. Donges, Matthew Jefferson* and *John W. Wescott.*

For the defendant, Wesley A. Hunsberger, *Thompson & Cole.*

For the other defendants, *Carrow & Kraft.*

The opinion of the court was delivered by

REED, J. This action was brought against five persons for publishing a libel concerning the plaintiff. The five persons were: D. Everett Todd, Harry H. Duncan, Sheriden Pressey, Rev. George L. Dobbins and Rev. Wesley A. Hunsberger.

The following are the facts which led up to the publishing of the article alleged to be a libel upon Mr. Butterworth, the plaintiff. All the parties are members of the Methodist Episcopal Church. Mr. Butterworth was a dealer in drugs and painters' supplies, in Philadelphia, and Mr. Todd was a painter in the city of Camden. Prior to the year 1900, Mr. Butterworth had sold to Mr. Todd a quantity of white lead, to be used by Mr. Todd in his business of house painting. Mr. Todd found that the work upon which this paint had been used was unsatisfactory; that the paint peeled, and he charged Mr. Butterworth with having sold him impure lead. This Mr. Butterworth denied.

The difficulty thus engendered led to a series of actions and counter-actions between Messrs. Butterworth and Todd. There seems to have been an action by Butterworth against Todd, and then a submission to arbitration of the differences between them, the award in which arbitration, Mr. Butterworth, for reasons stated on the trial, disregarded. A church trial for alleged perjury by Mr. Butterworth in the trial of one of the causes resulted in Mr. Butterworth's acquittal; this was followed by other actions, one by Butterworth against Todd for the amount of the bill for the lead sold to Todd, and a counter-action by Todd for selling impure lead, and finally an action for slander against Todd for stating that Butterworth had sold him impure lead, in which action a

verdict was obtained against Todd for $2,500. Then followed, at the intervention of certain members of the church, a settlement between Butterworth and Todd of their differences.

On July 24th, 1902, a paper was signed by Todd and Butterworth, in which Todd agreed to pay Butterworth $600, and Butterworth agreed to release Todd and by the instrument did release him from all further claims touching the question of impure lead. Todd agreed to drop the question as one forever settled.

Two years later Butterworth and Todd were candidates for election to municipal offices in the city of Camden, Todd being a candidate on the Democratic and Prohibition ticket for councilman of the Twelfth ward, Camden, and Butterworth being the regular Prohibition candidate for mayor of the city of Camden.

On October 27th, 1904, the following article was published in a newspaper called "The East Side Press," of Camden, headed "A Remarkable Confession:"

*"To whom it may concern:*

"I, the undersigned, D. Everett Todd, of the city and county of Camden, State of New Jersey, personally appeared before Caleb H. Butterworth, Rev. George L. Dobbins and Rev. Wesley A. Hunsberger, all of the city and county of Camden and State of New Jersey, deposeth and saith, that I have made certain charges and complaint against C. H. Butterworth, for which I was adjudged guilty in the Civil Court of Camden County, Camden, New Jersey, before a jury of twelve competent men, of slander, and called upon to pay said C. H. Butterworth the sum of twenty-five hundred dollars ($2,500).

"Now, therefore, be it known to all men that I, D. Everett Todd, confess that I was in error in making my complaint against C. H. Butterworth, and do verily believe that my trouble was due to the use of lucol oil which contained forty per cent. mineral oil (better known as coal oil) which was the cause of the houses peeling, and that Mr. Butterworth's lead to the best of my knowledge was not the cause. I deplore

and regret this my error in making this complaint against said C. H. Butterworth, and do now publicly and privately and over my signature apologize to said C. H. Butterworth and desire to take back any and all statements thus made against said Butterworth. I also wish to thank Mr. Butterworth for his kindness toward me in the settlement of the amount allowed him by the court, his generous offer to accept one-half (the words one-half were crossed out in ink and the figures $600 written above) of the full amount allowed to cover his expenses in prosecuting his case against me in self-defence and thus presenting me with twelve hundred and fifty dollars (the word twelve had been crossed off in ink and the figures 1900 written above). I pledge him my friendship and will do all I can to correct the error thus made by me.

"D. EVERETT TODD.

"WITNESS, Rev. G. L. D.
        "Rev. W. A. H."

Mr. Todd, knowing he had not signed a paper such as the published confession purported to reproduce, ascertained on inquiry from Mr. Connors, editor of the "East Side Press," respecting its authorship, that the original came from Mr. Butterworth.

On November 14th, a charge, in writing, was made against Mr. Butterworth, signed by Messrs. Pressey and Duncan, two members of the Methodist Episcopal Church. The complaint was that Mr. Butterworth had been guilty of immoral conduct, and specified—*first,* that he did knowingly utter and publish a false letter or article headed "A Remarkable Confession;" *second,* that he appended the name of D. Everett Todd to the paper; *third,* that he did forge, sign and cause to be signed to the manuscript of the aforesaid letter the names of Messrs. Dobbins and Hunsberger as witnesses, directing the newspaper to partly obscure or wholly withhold them at discretion; *fourth,* that the whole document was an absolute forgery, uttered, published and caused to be published in the said newspaper by Caleb H. Butterworth.

This complaint was, in accordance with the rules of the church, presented to the Rev. Wesley A. Hunsberger, the pas-

tor of the First Methodist Episcopal Church of Camden, of which church the plaintiff was a member. Dr. Hunsberger, under the rules of the discipline of his church, called in a committee of five to hear the complaint. This committee called upon Dr. Hunsberger to preside at an investigation, the result of which was a finding that Mr. Butterworth was guilty of the charges preferred. Thereafter Dr. Hunsberger, according to the requirements of the discipline of the church, sent the proceedings to the quarterly conference of the church. The matter was heard before that body, Dr. Dobbins, by virtue of his position as presiding elder, presiding. The result of that hearing was that Mr. Butterworth was suspended from the membership of the church for six months, with certain conditions for his restoration after that period.

Mr. Butterworth then appealed to the annual conference, and the committee whose functions were to hear the appeal affirmed the action of the quarterly conference.

All these proceedings seem to have been in conformity with the general rules embodied in the discipline of the Methodist Episcopal Church.

The complaint imputed immoral conduct to the plaintiff, and the acts set out as constituting such conduct were none the less immoral if they happened to be criminal. The jurisdiction of the church tribunal to hear the matters charged in the complaint is clear. It appears, therefore, that the complaint which constituted the alleged libel was presented by the church members to the pastor of the plaintiff's church, was regularly heard, and the proceedings forwarded to the quarterly conference, and an appeal taken to it and decided by the annual conference, in accordance with the law of the religious body with which all the parties were affiliated. The complaint and all the acts, words and votes of those who heard and decided upon the matters charged in the complaint originally, or upon appeal, were qualifiedly privileged, if they who complained and acted thereon believed the matters charged to be true.

This doctrine was well stated by Chief Justice Shaw in *Farnsworth* v. *Storrs, 5 Cush.* 412, 415, as follows:

"Among those powers and privileges established by long and immemorial usage, churches have power to deal with their members for immoral and scandalous conduct; and for that purpose to hear complaints, to take evidence and decide; and, upon conviction, to administer proper punishment by way of rebuke, censure, suspension and excommunication. To this jurisdiction every member, by entering into the church covenant, submits and is bound by his consent. The proceedings are *quasi*-judicial, and therefore, those who complain or give testimony, or act or vote or pronounce the result orally or in writing, acting in good faith and within the scope of the authority conferred by these limited jurisdictions, and not falsely or colorably make such proceedings a pretence for covering an intended scandal, are protected by law. If the charges are true, or if the defendants honestly believe them to be true, though they are in fact untrue, and believing them to be incompatible with the church principles and derogatory to the welfare of the church and the community where the church is established, the communication is privileged."

This doctrine is undisputed. 25 *Cyc.* 390, and cases cited.

That those who made the complaint had reason to believe it to be true appears beyond question.

The following are the facts appearing in the plaintiff's case respecting the way in which the publication of the alleged confession came about: As already observed, there were papers signed by Butterworth and Todd on July 24th, 1902, finally settling all differences between them. Mr. Butterworth says that previous to the conference at which these papers were signed he had prepared a paper which he intended to, and did, present to Mr. Todd for his signature at that meeting. Mr. Todd refused to sign this paper, but instead signed the paper already mentioned. The paper which Mr. Butterworth had prepared was the original of the published document headed "A Remarkable Confession" with the exception of the caption "A Remarkable Confession," and with the exception that in place of the name in full, D. Everett Todd, signed to the paper, the original had the initials D. E. T. attached, and in place of the words "Witness, Rev. Geo. and Rev. W. H." there

were in the original the words "Witness, G. L. and W. A.," all the initials being written with a lead pencil.

This paper, so prepared by Butterworth, after Todd had refused to sign it, Butterworth says he tore into two pieces with the intention of destroying it, but he subsequently retained it and placed it in an envelope which contained some newspaper clippings relating to his former differences with Todd. The envelope containing these clippings and this document was placed in his desk.

Two years later, when, as already mentioned, Todd was a candidate for a municipal office, Mr. Butterworth says he met one Connors while crossing the river between Camden and Philadelphia. Connors was conducting the newspaper in Camden already mentioned, "The East Side Press," and was using the paper in opposition to the election of Mr. Todd. Evidently knowing of the former trouble between Todd and Butterworth, he asked the latter if he had any material he could use against Todd in the then present political campaign. Butterworth replied yes, he believed he had some clippings over in his office, and if Connors would step in some day he would give them to him. Before Connors came after them, however, Butterworth wrote to him reminding him that the stuff was in his office. Connors thereafter called and got the envelope containing the clippings, among which was the original of the alleged confession. Connors, when a witness for the plaintiff in this trial, says that this paper was torn in two, and that he mounted it and headed it "A Remarkable Confession" when setting up the article, filling out the name of Todd in full at the bottom of the paper. It appears that before the publication of this paper Butterworth knew it was among the clippings he had given Connors, for he admits that he wrote to Connors a few days after delivering the papers, stating that in the body of this article were the names of Dr. Dobbins and Dr. Hunsberger, and he feared that Connors might use their names.

After this alleged confession by Todd appeared in the newspaper on October 27th, 1904, Todd, knowing that he had never signed such a document, visited Connors, the editor of the

"East Side Press," and inquired of him from whom he had obtained the document, and Connors admitted that it came from Butterworth, but no information was given by Connors respecting the addition he had made in writing the caption and filling in the full signature of D. Everett Todd. Mr. Butterworth was also interviewed, and from him came no intelligence respecting the alteration in the document he had given to Mr. Connors.

On November 14th, 1904, the complaint, which is charged as a libel, signed by Messrs. Duncan and Pressey, was lodged with Dr. Hunsberger, the pastor of the church of which the plaintiff was a member.

From these facts it is apparent that when the complaint was prepared and delivered to Dr. Hunsberger, all concerned in it could believe no otherwise than that Butterworth had put in the hands of Connors for publication a paper which purported to be signed by Todd, which paper Todd had never signed, and which contained a confession which Todd had never made. If such an apparent act, perpetrated by one church member at the expense of another, did not call for the exertion of the discipline of the church, it is hardly possible to conceive of a situation which ever would.

The complaint being made under the belief that it was true, the burden rested upon the plaintiff to prove the existence of express malice in making it. *King* v. *Patterson*, 20 *Vroom* 417; *Fahr* v. *Hayes*, 21 *Id*. 275; *Rotholz* v. *Dunkle*, 24 *Id*. 438, 441.

It should have been so charged as requested in defendant's first six requests.

If it had been so left to the jury, the question would confront us what evidence of malice on the part of the defendant appears in the case to destroy the qualified privilege which attended the lodging of the complaint.

So far as concerns Messrs. Duncan and Pressy there is no evidence, of any substance whatever, of malicious motives inducing their acts. From all the information obtainable by them and their friends, it was a clear case for a complaint, and there is nothing shown in their previous relations to But-

terworth which exhibits any malicious purpose at the time the complaint was signed, and, after the complaint was delivered, it took its usual course.

Respecting the defendant Todd, he had no differences with Butterworth from the time the agreement of amity was entered into between them, at the solicitation of the officers of the Methodist Episcopal Church of which they were both members. No act of his during the intervening two years is proved to show that he held any malicious feeling toward Butterworth. With the information he had when the charge was made, the imputation of malice in drawing the charge and inducing its presentation is unjustified by the circumstances surrounding the transaction.

As to Dr. Hunsberger, the pastor, and Dr. Dobbins, the presiding elder, it is manifest that their endeavors had been to placate the dispute between these men and save the church the scandal of two brothers contending in the civil courts in deplorable litigation.

When the complaint was lodged with Dr. Hunsberger, he acted with the most scrupulous fairness, by selecting a committee of five members of the Methodist Episcopal Church residing in Philadelphia, because they were outside the range of local feeling, and the names of those selected were exhibited by Dr. Hunsberger to Mr. Butterworth, and he expressed his satisfaction with the selection.

Respecting Dr. Hunsberger as well as Dr. Dobbins, after the reading of the letters written and the communication to the press in the light of the circumstances which induced them, they seem utterly inadequate to support a verdict based upon the notion that, assuming that these gentlemen counseled the framing of the complaint, their motives were not the interests of the church, but that it was a malicious purpose to gratify their own dislike for Mr. Butterworth.

It is indeed said that the use of the word "forged" in the charge is evidence of a malicious purpose. It seems to be quite true that the word "forged" was used in its general popular sense, meaning the fabrication of a false charge. The charge set out in full the document which Mr. Butterworth

was alleged to have falsely made, and so it appeared upon the face of the charge just what the written accusation was intended to charge.

The word "forge" as applied to the making of a false paper, whether such paper is capable of being a subject for a criminal falsification or otherwise, is a word of common as well as of correct etymological use.

Our conclusion is, that if the verdict is permitted to stand upon the testimony produced in this case, then no member of any church will hereafter dare to make a complaint to, or hear any complaint in, a church tribunal, for although it may be found to be true by every appellant tribunal, and although it indubitably appears that the charge was made by those who had every reason to believe it to be true, yet the complainant will be put to the hazard of a ruinous verdict against him in a civil action.

The intemperate character of the verdict appears in the amount awarded, namely, $8,000. This verdict, by reason of the joint action, stands against each and all of the defendants—against Messrs. Duncan and Pressy, as well as against Todd and the other defendants.

The testimony as to the plaintiff's loss of business resulting from the charge made against him, is of the most general character. It was impossible for the jury to gain any information aside from the mere declaration of the plaintiff and his witnesses, unsupported by any specific facts.

In awarding this large verdict little consideration seems to have been given to the plaintiff's own attitude in bringing about the publication in the "East Side Press." *Odg. Lib. & S.* 306, 307.

It is true that Butterworth says he did not intend Connors should publish the document put into his hands by the plaintiff, but that he only intended to have it used by Connors for the purpose of writing political squibs against Todd. He does not pretend that he imposed any restrictions on Connors, however, as to the use he should make of it, save that he did not wish him to use the names of Dr. Hunsberger or Dr. Dobbins. He knew the name of D. Everett Todd was in the body

of the document as the one who had made the confession, and that his initials were at the bottom of the document. It is difficult to conceive what significance he thought Mr. Connors would give to a paper thus put into his hands to use against Todd other than to regard it, at least, as a memorandum of a confession made by Todd.

But if Mr. Butterworth's purpose was merely to furnish Connors with material for political squibs, it is not perceived how the quality of his act is improved. The whole sting of the document is that Todd made a confession of certain things, and any political squibs which stated or hinted that Todd had done this would have been as false as the publication of the document itself.

The position of the plaintiff was, then, that after two years of amity with Todd, he voluntarily put into the hands of an editor such a document to be used for the purpose of affording materials for injuring the reputation of a fellow-member of the Methodist Episcopal Church, which material was untrue in fact, and which act led to the making of the complaint, which, through lack of information of the complainants, technically charged too much, but was substantially true.

We think, for these reasons, the rule should be made absolute.