38 N.J. Super. 317 (1955)
118 A.2d 854
CARL JORGENSEN, PLAINTIFF-RESPONDENT,
v.
THE PENNSYLVANIA RAILROAD COMPANY, A CORPORATION, DEFENDANT-APPELLANT, AND JOHN E. ULICH, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1955.
Decided December 5, 1955.
*323 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Stephen VR. Strong argued the cause for the appellant (Messrs. Strong & Strong, attorneys).
Mr. Stanley W. Greenfield argued the cause for the respondent.
The opinion of the court was delivered by FRANCIS, J.A.D.
Plaintiff was the recipient of various compensatory and punitive damage verdicts against his former employer, The Pennsylvania Railroad Company. All of them are assailed as invalid for reasons to be discussed herein.
*324 The factual background which gave rise to the litigation is not complicated. The problems stem largely from the conflicting views of the parties as to the legal principles which are applicable to the facts and as to the effect of these principles when applied to the facts.
Prior to June 16, 1953 Jorgensen had been in the employ of defendant railroad as a dining car steward for seven and one-half years. At the time of the trial he was 58 years of age, married and had two sons, one 23 and the other 17 years of age. As steward he was in charge of the dining car, including the crew assigned to it, cooks, waiters and any other help, the food and equipment.
Members of the dining car crew and the steward were permitted to take their regular meals without charge when they were on duty. There was no fixed time for their meals; apparently they ate when doing so would not interfere with the service to passenger patrons. However, it was against the company rules to take food from the train in a personal bag or brief case for consumption at home or elsewhere.
On June 13 Jorgensen went on duty at Pittsburgh. From there the train went to Harrisburg. It was scheduled to move on to Philadelphia and the dining car crew were to alight at Harrisburg if the meal to be served in the course of the approach to that city was completed in time to permit them to do so. This eventuality occurred and they left the train; the car then deadheaded into Philadelphia.
The dining car contained a small bar and refrigerator at one end, the end used for exit purposes; at the other was the kitchen in which there was a larger refrigerator. The galley was well stocked with ham, bacon, chicken, fish and roast beef.
On the way into Harrisburg Jorgensen took a small butt end of a ham from the kitchen refrigerator, intending to make himself a sandwich. This remnant weighed a pound or a pound and a half; there was not enough meat on it to obtain a single slice of the size which would be served normally to a patron. It would make about three sandwiches. And it was the kind of leftover which ordinarily *325 was chopped up and used by the crew for their ham and eggs dish. No one suggests that any misconduct would be involved if the steward ate this much ham himself.
The piece of ham was put in the small bar refrigerator until Jorgensen could find time to make his sandwich. No such opportunity presented itself on the way into Harrisburg, but expecting the car to lay over, he intended to do so there. However, as indicated, the entire train moved on to Philadelphia. A day or so later he again took over the car in Washington, D.C., and on June 16 was in charge of it on the run into New York.
On arrival at the Pennsylvania Station in New York, his personal belongings, shirts, socks, underwear, about 250 meal checks, some pencils, waiters' badges, rubber bands and about $25 in rolls of change, were in his brief case. The company property was to be turned in at the proper office at the station. There is no charge that anything was wrong in this connection. It was his duty to see that the kitchen was locked up. Apparently, from his testimony, he remembered the piece of ham which had been left in the bar refrigerator. Intending to put it in the kitchen refrigerator, he picked it up in a napkin and carrying it in his hand started to walk toward the kitchen at the other end of the car. This was away from the exit door. In doing so, he went past three members of the dining car crew. These men, two of them of almost 30 years' service each, testified in his behalf at the trial and provided substantial corroboration for his version of this part of the incident.
As Jorgensen was moving toward the kitchen, John E. Ulich, defendant's supervisor of service, and two railroad police officers, L.B. Olcott and A.E. Canino, came into the car. Ulich and one officer entered at the exit door and the other officer appeared at the kitchen end. Ulich announced to the crew members, who were preparing to leave, that a spot inspection was going to be made and that all of them were to open their bags.
At the order for inspection Jorgensen said he stopped and placed his bag and the piece of ham in the napkin on one *326 of the tables. Ulich walked up to him, picked up the ham in the napkin, and said to one of the officers: "Hold that man." Ulich retained the ham, making no response to the question: "What are you trying to do to me?" He talked with the officers who then told Jorgensen to follow them.
They took him to the railroad police department office located in the station and detained him there for two or two and one-half hours. During this period the union representative came in, apparently to find out what the difficulty was and to look after Jorgensen's interests. He was denied permission to do so and was ordered to leave. Jorgensen wished to telephone his wife because she was waiting for him but this was not allowed.
The police officers (four or five of them being present) asked if he wished to make a statement, but when he described the ham incident the officer who had prepared to take it walked off saying: "Well, that's a good story if you can believe it."
One of the officers prepared a two-line resignation, effective immediately, and asked him to sign it. He was told if he did not affix his signature he would be taken to jail. He said he was nervous and apprehensive, never having been in jail in his life, and never having been charged by the railroad with stealing anything, although he had handled dining car receipts and a "bank" of $200 (used for making change) for almost eight years. Consequently he signed in order to obtain his release and he told the officers he would repudiate it as soon as he got outside. When he was allowed to leave after turning in his bank, his receipts from the trip just completed, another $200, and his railroad pass, he went to see Mr. Geren, the Superintendent of Dining Car Service, and explained the situation to him.
Thereafter he informed Mr. A.J. Ellis, local chairman of his union, about the matter and then engaged an attorney to represent him. On June 18 Ellis wrote to the company, asking that Jorgensen be given a trial as required by the union contract. On June 22 the attorney made the same request.
*327 Jorgensen was a member of Lodge No. 162 of the Brotherhood of Railroad Trainmen, the accredited statutory representative of the employees for collective bargaining purposes under the Railway Labor Act, 44 Stat. 577 (1926), 45 U.S.C.A. §§ 151-188 (1954). A contract regulating wages, hours and working conditions of the employees, including the plaintiff, was in force between the brotherhood and the railroad at the time in question.
Among other things, the contract provides:

"Rule No. 6  Discipline.
"6-A-1. Employes will not be suspended nor dismissed from the service without a fair and impartial trial; neither will they be held off duty for minor offenses pending investigation or decision. Witnesses will be examined separately, but in event of conflicting testimony, those whose evidence conflicts will be examined together. Employees will be notified in writing ten days prior to date suspension takes effect.

* * * * * * * *
6-A-3. An employe required to attend investigation may be accompanied by an employe of his own selection, who will be permitted to question witnesses so far as the interests of the employe is concerned.

* * * * * * * *

Rule No. 7  Appeals.
7-A-1. An employe who considers that an injustice has been done him, and who has appealed his case in writing to his Superintendent within ten days, will be given a hearing at which he may be accompanied by an employe from the district in which he is employed to assist him in presenting his case. After his appeal has been acted upon by the Superintendent, he may, if he so desires, be represented before the Superintendent [of the Dining Car Service] and General Superintendent [later changed to Manager, Dining Car Service] by the Committee representing employees covered by these regulations.
7-B-1. If the charge against the employe is not sustained, it will be stricken from the record. * * *."
This agreement and the stipulations with respect to such grievances were made pursuant to section two of the Railway Labor Act, 44 Stat. 577 (1926), 45 U.S.C.A. § 152 (1954). Section three thereof, 44 Stat. 578 (1926), 45 U.S.C.A. § 153, says that:
"(i) The disputes between an employee * * * and a carrier * * * growing out of grievances * * *, shall be handled in *328 the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board [National Railway Adjustment Board] with a full statement of the facts and all supporting data bearing upon the disputes."
As the result of the letters referred to, an investigation hearing, presumably under Rule 6-A-1, was held on June 29, 1953. Jorgensen, his attorney and the union local chairman attended. He was informed by John J. Reilly (whose official capacity was Budget Manager, and who was in charge of the proceeding) of the charge reported by Ulich, and advised that the investigation was being held to permit him to make an explanation. After some discussion, a short statement of denial was made. At its conclusion by agreement the trial date of July 3 was fixed and he was advised that in the meantime he would not be allowed to return to work.
On June 29 the company sent a registered letter to Jorgensen at home, and to his attorney, confirming the trial date and setting out specifically the accusation which was to be heard. The exact contents of this letter will be set forth at a more appropriate point.
It may be noted with respect to this letter, as well as the one of July 6 hereafter mentioned, that no reference was made to the resignation signed on June 16 and no effort seems to have been made by the company to place reliance upon it at the hearings.
On July 3 and 8 the trial was conducted. The presiding officer was again Reilly; the same representatives of the accused were present, as well as the various witnesses (although all of them were not on hand at the same time) and an assistant personnel manager appeared; the testimony was taken stenographically.
At the opening of the hearing, Reilly read into the record the letter of June 29 containing the charge. Jorgensen conceded having received it and said that he was ready to proceed. When the matter was not concluded on July 3, a *329 letter dated July 6 was sent formally notifying him of the adjourned date and again setting forth the charge for which he was being tried. On July 8 this letter was read into the record and Jorgensen acknowledged that he had received it.
At the company trial Ulich and the two police officers, Olcott and Canino, gave their version of the events of June 16. In defense, Jorgensen recounted the facts detailed above and produced three fellow employees, Coalbrook, the second cook, Washington, the chef (both of whom were witnesses at the Law Division trial) and Dudley Blackman, a waiter, all of whom provided support for the statement that Jorgensen was carrying the ham in a napkin in his hand and walking toward the kitchen when the inspection took place.
On July 22, the following formal notice of dismissal was sent to the accused:

"THE PENNSYLVANIA RAILROAD NOTICE OF DISCIPLINE FOR OFFENSE OCCURRING ON DINING CAR DEPARTMENT
Long Island City, N.Y., July 22, 1953
Name  Carl Jorgensen. Occupation  Steward.
Home Division  New York Region.
Discipline  Dismissal from the service of the Pennsylvania Railroad Company.
Date of Occurrence  June 16, 1953.
Place  New York.
Outline of Offense: 
`On June 16, 1953, when your personal bag was inspected just prior to your detraining from dining car 7943, train No. 112 at Pennsylvania Station, New York, N.Y., it was found to contain a quantity of ham (company property) wrapped in a company napkin.'
 E.H. Fausnaugh,
 Supervisor Operations."
Whether a copy of this was mailed or delivered to any other person does not appear.
On July 27 the union local chairman Ellis appealed to J.R. Geren, Superintendent of Dining Car Service, who shortly thereafter held a conference with him and Jorgensen. On August 7 Geren wrote to them referring to their visit and quoting the charge appearing in the company's earlier *330 letters. He advised that "[a]fter giving thorough consideration to all of the facts in the case" he found no reason for changing the discharge.
On August 8 Ellis filed another appeal to S.N. Phelps, the Manager of the Dining Car Service. Phelps acknowledged the filing and suggested that even though Geren had rejected the appeal to him, it was necessary under the grievance procedure to docket the case for discussion again with Geren at one of the union-company monthly meetings; then if the union was still dissatisfied, a joint submission might be prepared for the purpose of progressing the case to him. On receipt of this information, Jorgensen said he felt that further attempts to persuade the company to reverse his discharge would be futile. So instead of continuing his efforts to obtain reinstatement and back pay, he treated the discharge as final and brought this suit.
The amended complaint, which was filed on March 6, 1954, contains seven counts. The first count alleges that the defendant by its agent Ulich willfully, maliciously and falsely slandered Jorgensen in the dining car on June 16, 1953 by accusing him of stealing the ham in the presence of fellow employees and the railroad police officers. Compensatory damages are claimed.
The second count alleges that on June 29, 1953 defendant by its agents "wilfully, falsely and maliciously wrote and published or caused to be written or published" the precise charge which is contained in the notice of dismissal set forth above. Compensatory damages are sought.
The third count seeks recovery for unlawful imprisonment and is predicated upon the detention of June 16, 1953 on the train and in the railroad police offices in the railroad station. Compensatory damages are claimed.
The fourth count charges that the defendant discharged Jorgensen without just cause as the result of which he had been deprived of past and future earnings. The ad damnum clause is for punitive damages only.
The final three counts claim punitive damages for the slander, libel and false imprisonment.
*331 At the conclusion of the trial, the jury returned the following verdicts for the plaintiff:
$17,500 compensatory damages for the unlawful discharge;
$2,500 compensatory and $10,000 punitive damages for the false imprisonment;
$40,000 compensatory and $10,000 punitive damages for the slander and libel.
Subsequently the trial court reduced the $40,000 compensatory defamation award to $20,000. The reduction was based upon the court's feeling that the jury probably had mistakenly included loss of wages as an element of damage under both the unlawful discharge and defamation counts, thus bringing about a double recovery for that loss.
It should be noted that although the cause of action for unlawful discharge demanded punitive damages alone, no objection was interposed when the court in his charge to the jury submitted the issue as one for compensatory damages only. No contention is made on this appeal that such action was improper. In any event, after a recital of plaintiff's factual contention in the pretrial order, this broad language appears:
"* * * Plaintiff was discharged from his job after eight years of employment and as a result of the actions of the defendant has been unable to obtain other employment; that the charges and arrest were improper, without just cause and were malicious. Plaintiff seeks to recover compensatory and punitive damages."
Presumably that description of the damage claim was considered justification for the presentation of the unlawful discharge problem in the fashion described.
This recital brings us to the specific attacks on the various verdicts. It is necessary to consider them separately.

I.

UNLAWFUL DISCHARGE
Although the cause of action for unlawful discharge was pleaded in general language, simply stated it alleges a discharge "without just cause."
*332 At the trial the court took the position that under the collective bargaining agreement, the only way the railroad could discharge the plaintiff was in accordance with the seniority clause. In effect, the holding seems to have been, although it is not entirely clear, that since the contract contained no reservation of right to terminate an employee's services for just cause (such as improper conduct), the "sole basis" for the alleged invalidity of the discharge would have to be that it was not "in accordance with the contract which provided for dismissals according to seniority." The seniority clause provides:
"3-C-1. In reducing forces, fitness and ability being sufficient, in accordance with provisions of Rule 2-A-1, seniority shall prevail in selecting those to be retained in service."
Such a theory was not pleaded in the complaint or pretrial order. It did not come into the case until all of the proof was in except for some rebuttal testimony of Jorgensen. Just before this was done, the court's theory was introduced and he pointed out to counsel that no proof had been offered to show Jorgensen's seniority status. The rebuttal testimony (really a recall of the witness to put in some additional direct case proof) was to concern itself with damages. However, the court indicated that he might ask a question giving defense counsel time to object.
When Jorgensen resumed the stand, the court inquired as to whether at the time of his dismissal there were other employees on the rolls who were junior in service to him. He replied that there were. Counsel objected and moved to strike, saying that the issue was not in the case and he was not prepared to meet it at that stage of the proceedings. But the testimony was allowed to stand.
Both counsel disagreed with the court's thesis. Plaintiff's counsel said:
"I think, in fairness, sir, the contract calls for charges and substantiation of them at trial. I say that he was wrongfully discharged under the terms of that contract, and I don't limit it merely to seniority.
*333 THE COURT: Well, the charge was sustained at the railroad trial and the appeal was abandoned. So far as that goes, there was nothing wrongful in the discharge. I would think the only possible breach of the contract is that he was discharged not in the numerical order of his seniority * * *.

* * * * * * * *
MR. GREENFIELD: I submit this, sir, that under the terms of the contract with regard to discharge, even beyond seniority, there was a wrongful discharge. I refer to the terms of the contract, I think it is six and seven. So that above and beyond any question of seniority, we allege there was a wrongful discharge; considering all the facts in this case, there was no reasonable basis for it.
THE COURT: No, I can't accept that theory, Mr. Greenfield."
The view of the trial court with respect to the company trial as to the alleged taking of the ham, was that the determination of guilt there was binding and conclusive and could not be questioned in this judicial proceeding. As to that hearing and its resultant discharge, only two questions were open for jury consideration: (1) whether the hearing was a fair one, and (2) even if it was fair, since a finding of guilt, though binding on that question, would not justify discharge except in accordance with the seniority clause, was Jorgensen's dismissal violative of his seniority rights. And in expounding this view to the jury in the charge, the implication is reasonably plain that even if they found that after a fair trial plaintiff was found guilty of appropriating the ham, he could still recover damages if his seniority rights were violated by the discharge. Moreover, the jury was told that "obviously the termination of Mr. Jorgensen's employment in this case was not by virtue of seniority, because under the sole evidence in the case on this point there were other dining car stewards of his class and his station and his grouping who were less in years of service than he."
In our judgment this was error, not only because plaintiff's theory of liability was not founded by pleading or pretrial order on the seniority issue and defendant was not prepared to meet it, but also because it represented a misconstruction of the union-employer contract. Cf. Hodgson v. Pohl, 9 N.J. 488, 491 (1952).
*334 It is true that the contract sets forth no specific cause for discharge; nor does it even say that employees may be discharged for cause. But a study of the document makes the conclusion inescapable that discharges for cause were contemplated by the parties.
Under the seniority clause employees could not be dropped or laid off in the event of a reduction in force except according to length of service (fitness and ability being present). While this did not create tenure in the sense in which that status is spoken of in public employment, it did establish a certain security of employment which protected the worker from temporary or permanent loss thereof except in accordance with seniority. Cf. Walker v. Pennsylvania-Reading S.S. Lines, 142 N.J. Eq. 588, 600 (Ch. 1948). But does it mean that the company by such a stipulation deprived itself of the right to fire a wrongdoer if he happened to be the senior of faithful employees in point of service? The answer to this stems irrefutably, we think, from Rules 6 and 7 and their subdivisions, which are recited above.
These rules are entitled "Discipline" and "Appeals." They provide for a fair and impartial trial before suspension or dismissal; for investigations of offenses; for appeals where the employee considers that he has suffered an injustice in a disciplinary matter, for hearing and representation on the appeal; for the striking of an unsustained charge from the employee's record; for back pay in suspension cases where the charge is not sustained. Thus clearly to be implied is a covenant that employees would be dischargeable not at the employer's will but only for just cause.
Informative on this subject is Illinois Cent. R. Co. v. Moore, 112 F.2d 959 (5th Cir. 1940), reversed on other grounds, 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089 (1941), involving a suit for damages for wrongful discharge under a labor contract similar to the one involved here. The Circuit Court of Appeals said:
"We find in these provisions a clear implication that discharge is not to be at the employer's will, but only for a just cause, and *335 it would be unreasonable, without express provision to that effect, to hold that the railroad officers are the sole or the final judges of the justice of the cause. * * *" 112 F.2d, at page 966.
A dismissed employee is not bound to seek relief or review in all or any one of the administrative tribunals mentioned in a bargaining agreement such as the present one, nor in the National Railroad Adjustment Board. He may accept the discharge as final  not in the sense of conceding that it was for just cause, but simply as indicating that it has terminated his employment and that reinstatement is not sought  and then sue at law for damages if the discharge was unlawful. Nor does an adverse determination by an intra-company tribunal bar his action for damages in the courts. Illinois Cent. R. Co. v. Moore, supra, 112 F.2d, at page 966. In fact, a decision by the Adjustment Board in a matter clearly committed to it in the first instance is not regarded as final and binding on the courts. Elgin, J. & E. Ry. Co. v. Burley, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946); Thomas v. New York C. & St. L.R. Co., 185 F.2d 614 (6th Cir. 1950); Dahlberg v. Pittsburgh & L.E.R. Co., 138 F.2d 121 (3d Cir. 1943); Washington Terminal Co. v. Boswell, 75 U.S. App. D.C. 1, 124 F.2d 235 (D.C. Cir. 1941), affirmed per curiam by an equally divided court 319 U.S. 732, 63 S.Ct. 1430, 87 L.Ed. 1694 (1943).
When the Moore case, supra, reached the United States Supreme Court it was reversed, but for a reason which is not pertinent to the inquiry in this case. However, with respect to the existence of a duty to exhaust administrative remedies before the institution of a common-law action, the court said:
"But we find nothing in that Act [Railway Labor Act] which purports to take away from the courts the jurisdiction to determine a controversy over a wrongful discharge or to make an administrative finding a prerequisite to filing a suit in court." 312 U.S., at page 634, 61 S.Ct., at page 756, 85 L.Ed., at page 1092.
Later the same court held that disputes concerning the interpretation of collective bargaining agreements between *336 railroads and unions and jurisdictional controversies between different unions or classes of employees were committed by the Railway Labor Act in the first instance to the exclusive jurisdiction of the Adjustment Board. Order of Railway Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946); Slocum v. Delaware, L. & W.R. Co., 339 U.S. 239, 244, 70 S.Ct. 577, 94 L.Ed. 795, 800 (1950). And still later certiorari was granted in Transcontinental & Western Air., Inc., v. Koppal, 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325 (1953), because of differing views as to the effect of the opinions in the Moore, Pitney and Slocum cases, supra.
Factually, Transcontinental & Western Air, Inc., v. Koppal is quite similar to our case. The employee was charged with abuse of sick leave provisions of the master contract and notified that a hearing would be held thereon as required by the agreed grievance procedure. After the hearing, the presiding officer (a representative of the company) stated that there had been a severe abuse of the sickness policy and that the employee would be discharged. However, in view of his past favorable record, he could resign if he preferred at the same time preserving his right of appeal. A resignation was tendered "under protest" and a common-law damage action for unlawful discharge was instituted.
Justice Burton, speaking for the court, referred with approval to the language used in the Slocum case in explaining the Moore case, to the effect that the Railway Labor Act does not bar courts from adjudicating unlawful discharge cases. "`A common-law or statutory action for wrongful discharge differs from any remedy which the Board has power to provide, and does not involve questions of future relations between the railroad and its other employees.'" [345 U.S. 653, 73 S.Ct. 910.] However, "`[I]f a court in handling such a case must consider some provision of a collective-bargaining agreement, its interpretation would of course have no binding effect on future interpretations by the Board.'"
*337 And the opinion concludes:
"The result is that, whereas, under the Railway Labor Act, the Adjustment Board has exclusive jurisdiction to adjust grievances and jurisdictional disputes of the type involved in the Slocum case, that Board does not have like exclusive jurisdiction over the claim of an employee that he has been unlawfully discharged. Such employee may proceed either in accordance with the administrative procedures prescribed in his employment contract or he may resort to his action at law for alleged unlawful discharge if the state courts recognize such a claim. Where the applicable law permits his recovery of damages without showing his prior exhaustion of his administrative remedies, he may so recover, as he did in the Moore litigation, supra, under Mississippi law.
On the other hand, if the applicable local law, as in Missouri, requires an employee to exhaust his administrative remedies under his employment contract in order to sustain his cause of action, he must show that he has done so." 345 U.S., at page 662, 73 S.Ct., at page 910, 97 L.Ed., at page 1331.
In New Jersey the necessity to exhaust administrative remedies provided by a union contract or by the Railway Labor Act in cases of unlawful discharge has not been discussed specifically before or since 1953. However, this court in Piscitelli v. Pennsylvania-Reading S.S. Lines, 11 N.J. Super. 46 (App. Div. 1950), sanctioned the prosecution of such an action at law and the implication is plain therefrom that the extra-judicial remedies had not been pursued. And the Supreme Court seemed to approve this aspect of the Piscitelli case in Marchitto v. Central R. Co. of New Jersey, 9 N.J. 456, 464 (1952).
Appellant suggests that Schlenk v. Lehigh Valley R. Co., 1 N.J. 131 (1948), must be construed as to the contrary. We cannot agree because the court expressly said:
"* * * [W]e do not deem it necessary to pass on the question raised as to the necessity of the complainant exhausting his remedies before the National Railroad Adjustment Board." 1 N.J., at page 137.
In any event we hold the view that where the objective of a discharged employee is the continuance or resumption of relations with his employer  that is, reinstatement with *338 or without back pay  he must pursue his contract remedies and that provided by the Adjustment Board before any relief can be sought in the courts. Marchitto v. Central R. Co. of New Jersey, 18 N.J. Super. 163 (App. Div. 1952), certification denied 9 N.J. 403 (1952); Piscitelli v. Pennsylvania-Reading S.S. Lines, supra. But where the employee, as here, accepts the termination of the employment status and charges that he was wronged thereby, not only is no adequate remedy for future damage provided by the contract or by the Railway Labor Act, but such remedy does not appear to have been contemplated by either of them. In this situation, he should have his action at law for damages and failure to resort to the grievance machinery should not stand in his way.
This disquisition on the jurisdiction of the Law Division brings us back to the study of the legal propriety of the action of the trial judge in injecting into the case the issue of discharge in violation of contract seniority and in submitting that issue to the jury as a basis for defendant's liability. As already indicated, such a theory was neither presented nor tried by the parties. There was no suggestion in the pleadings, pretrial order or evidence adduced by the plaintiff that he was the victim of a reduction in the working force. Both sides recognized that he was discharged because of a company decision that the piece of ham was found in his personal bag. And basically they prepared for and undertook to try out the legality of his discharge  whether there was cause therefore  which (aside from the problem of fair and impartial trial) involved a determination of whether or not Jorgensen in fact had the ham in his bag and was preparing to leave the train with it. It was undisputed that the company rules would be transgressed if he put the article in his bag intending to appropriate it.
So the question of whether or not Jorgensen was guilty of the charge set forth in the notice of dismissal should have been submitted to the jury, if a factual issue on the subject was presented by the proofs. Also, in our opinion, in such case they should be told that if they found *339 him guilty of the offense on the evidence submitted, there should be a verdict in favor of the defendant on the unlawful discharge count; and that if they reached the opposite conclusion the right existed to recover the damages which proximately flowed from the discharge. Moreover, in our view the interests of justice would be served by an instruction that if the jury found that the proof furnished to them sustained the charge, it was no part of their function to pass upon the propriety or severity of the penalty imposed by the employer, i.e., discharge. Punishment for the transgression not being regulated by the contract or the Railway Labor Act, rested in the discretion of the railroad. Schlenk v. Lehigh Valley R. Co., supra, 1 N.J., at page 137.
For the reasons indicated, it was erroneous to permit the liability of the employer to depend upon whether the discharge violated the seniority rights of the plaintiff under the employment contract. Normally this would lead to a reversal of the portion of the judgment involved. But such result does not follow as of course; it is required only when the error is prejudicial, in the sense that it is inconsistent with substantial justice. R.R. 1:5-3(b); Terminal Const. Corp. v. Bergen County, etc., Sewer District Authority, 18 N.J. 294 (1955).
Is the error of the quality requiring reversal? The proof in the case relating to the train incident, the circumstances of the accusation, the nature of the accusation, the absence of foundation for it, and the discharge, stands without specific contradiction. The defendant offered no witnesses specifically to refute Jorgensen's assertion that he never had the ham in his bag. Ulich, who made the complaint, and the officers who accompanied him at the time, were in court but were never called. The surprising failure to call these persons as witnesses would justify an inference by the jury that they were not asked to be sworn because their testimony would have been unfavorable to the defendant. Series Publishers, Inc., v. Greene, 9 N.J. Super. 166 (App. Div. 1950); Drennan v. Housman, 7 N.J. Misc. 91 (Sup. Ct. 1929); Nelson v. Public Service Transportation Co., 5 N.J. Misc. *340 73 (Sup. Ct. 1926); Roach v. Yellow Cab Co., 6 N.J. Misc. 386 (C.P. 1928); 2 Wigmore, Evidence (3d ed. 1940), §§ 285, 286. In fact, in Drennan v. Housman, supra, the Supreme Court sustained a charge of the trial court that in such a situation the jury might infer that whatever testimony the uncalled witness might have given would have been unfavorable.
In this posture of the case, was there anything which stood in the way of an instruction by the court to the jury as a matter of law that the unlawful discharge cause of action had been established and that their duty was limited to the admeasurement of damages? It will be recalled that plaintiff, through his union agent and his attorney, called for a departmental trial to which he was entitled contractually. The request was granted and on unsworn testimony before a company official he was found guilty. Pursuit of the second step in the grievance process, apparently a review of the record, by a higher railroad official in the same general department, resulted in an affirmance of the finding. Then, after an abortive effort to proceed further, he decided that it would be futile, accepted his discharge as final and sought judicial relief. Are these two adverse findings, coupled with the abandonment of the grievance process, of any probative force against his testimony at this trial, especially in the light of defendant's failure to call any witnesses to disprove his statements?
As already shown, the right existed to shun or to abandon the administrative remedy and to proceed with the common-law action. The cases cited above stand for the principle that even if the grievance procedure had been followed through to the Adjustment Board with adverse results to the disciplined employee, the determination would not be conclusive on the courts but at most presumptively correct or creative of a prima facie case or equal to the testimony of an expert witness in the common-law trial. Here the efforts to obtain reinstatement in the fashion provided by the contract were abandoned at an early stage, so that the unfavorable result to Jorgensen was limited to the hearings by *341 company representatives; the step where company and union officials would participate in the review had not been prosecuted.
But the form of trial and appeal represented mutual agreement arrived at through the medium of collective bargaining. In negotiating a contract regulating wages, hours and conditions of employment, the Brotherhood acts as the statutory representative of the employees clothed by Congress "with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents" subject to the duty of exercising the power fairly in the interests of the employees. Steele v. Louisville & N.R. Co., 323 U.S. 192, 202, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Lewellyn v. Fleming, 154 F.2d 211 (10th Cir.), certiorari denied 329 U.S. 715, 67 S.Ct. 45, 91 L.Ed. 620 (1946). Plaintiff voluntarily took advantage of the right of trial, and at least one step of the appeal process thus created and in those proceedings (just as in the common-law action) the crucial consideration was his guilt or innocence of the offense of taking the ham. Thus, although he abandoned the steps remaining open for review of the finding of guilt, and as the result the determination did not attain the significance that would attach if it emanated from the Adjustment Board, it cannot be said to have been barren of probative influence at the Law Division damage action. Some evidential force must be deemed to inhere in the adverse finding; and the relinquishment of the appeal is also susceptible of an unfavorable inference. That favorable as well as unfavorable inferences may be drawn from a given circumstance ordinarily does not militate against admissibility of the proof; rather it calls into operation the judgment of the fact finders.
Moreover, defendant produced John M. Sweeney, the railroad policeman who prepared plaintiff's resignation. The substance of his testimony was that while Jorgensen was at the railroad police offices, he inquired as to what was going to be done with him; if they were going to put him in jail. Sweeney said he did not know, and then Jorgensen asked *342 whether he would be allowed to resign. Inquiries were then made of the proper persons and the information was transmitted that a resignation would be acceptable. Sweeney then prepared the paper and Jorgensen signed it. Such statements and conduct, even though denied by Jorgensen in his direct case, manifestly give rise to inferential inculpatory admissions on his part.
Therefore, there was some evidence in opposition to plaintiff's testimony that the ham was not in his bag. As a consequence it was necessary to send the question to the jury for decision. Under the circumstances the error in the charge must be considered prejudicial. Accordingly, the judgment is reversed on this count and a new trial ordered.

II.

DEFAMATION
The complaint bases the libel count upon the defendant's letter of June 29 which contained the following charge upon which Jorgensen was to be tried on the date fixed therein:
"On June 16, 1953, when your personal bag was inspected just prior to your detraining from dining car 7943, train No. 112 at Pennsylvania Station, New York, N.Y., it was found to contain a quantity of ham (company property) wrapped in a company napkin."
The innuendo alleged is that the plaintiff was in the act of stealing or intended to steal the ham.
This letter was sent to plaintiff and his counsel (and to no one else so far as the record shows), in response to their demand for the trial to which he was entitled by the labor compact.
The charge was repeated in quotes in the defendant's letters to Jorgensen of July 6 formally advising him of the adjourned date of the hearing, of July 22 notifying him of the discharge, of August 7 denying relief on the appeal, and on August 10 which outlined the procedure for the next higher appeal. All of these missives (received in evidence *343 without objection) were mailed to Jorgensen alone, except that a copy of that of August 7 was sent to A.J. Ellis, the Brotherhood of Railroad Trainmen representative. However, one of the letters was read at the opening of the trial on each hearing day in the presence of two company representatives who apparently were in charge of the proceedings, the reporter who took the testimony, Mr. Ellis, plaintiff's counsel, and some of the witnesses. The record discloses no further instances of actual publication of the alleged libel. It seems proper to add that the reading of the charge at the hearings particularly in the presence of fellow employees may justify in the minds of jurors the conclusion that there was reasonable ground to suppose that it would become known to others as a result. Kelly v. Hoffman, 137 N.J.L. 695, 701 (E. & A. 1948).
The answer of the defendant did not plead the truth of the accusation contained in these various writings. But in the recital of factual and legal claims in the pretrial order it said:
"There was detected in plaintiff's personal bag among his personal effects a ham wrapped in a company napkin which plaintiff was prepared to carry home with him. Plaintiff in a nervous condition asked the employee to give him a break and forget about it. * * * Any publication of the charge was made pursuant to the union contract. This defendant relies upon the truth thereof, and that any publication of the alleged slander or libel was privilege [sic]. * * *."
We need not linger in discussion as to the character of these writings. An unavoidable implication is that Jorgensen had stolen or was engaged in stealing the piece of ham. As such on their face they were libelous per se. 33 Am. Jur., Libel and Slander, § 31 (1941).
Defendant claims immunity on the theory of privilege. If any privilege existed, it did not reach the height of an absolute one. Cf. Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552 (1955). But in our view, the circumstances establish a case of qualified privilege, which is said to arise:
*344 "* * * where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, * * *." Finkelstein v. Geismar, 91 N.J.L. 46, 48 (Sup. Ct. 1917).
The Railway Labor Act imposes a mandate upon carriers "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise * * *." All disputes with the employees are ordered to be considered and, if possible, decided, in conference between carrier and employees' representatives and it is the statutory "duty" of such representatives in the event of disputes arising out of grievances to confer thereon within ten days after a request to do so. Section two, supra. Carriers are required to notify the workers by posted notices that all disputes shall be handled in accordance with the Act. Subsection-eighth. Willful failure to do so is made a misdemeanor. Subsection-tenth. Section three, supra, provides that grievances growing out of working conditions are to be handled in the usual manner, obviously meaning as the union contract prescribes, up to and including the chief operating officer of the carrier designated for the purpose, and if adjustment is not accomplished, the matter may be referred to the Adjustment Board on petition of either party.
Having in mind the statutory background and the collective bargaining agreement produced thereby, we have no hesitancy in holding that a qualified privilege existed in the case at bar. When Jorgensen and his attorney demanded the trial, the company was under an obligation to grant it. And when the notices of the hearings and the result thereof were issued, the statement of the charge to be tried was entitled to the benefit of the privilege.
An illustrative example of the type privilege is found in Butterworth v. Todd, 76 N.J.L. 317 (Sup. Ct. 1908). There a complaint made by church members against another *345 member in accordance with the discipline of the church was declared to be qualified privileged. The court said:
"The complaint imputed immoral conduct to the plaintiff, and the acts set out as constituting such conduct were none the less immoral if they happened to be criminal. The jurisdiction of the church tribunal to hear the matters charged in the complaint is clear. It appears, therefore, that the complaint which constituted the alleged libel was presented by the church members to the pastor of the plaintiff's church, was regularly heard, and the proceedings forwarded to the Quarterly Conference, and an appeal taken to it, and decided by the Annual Conference, in accordance with the law of the religious body with which all the parties were affiliated. The complaint, and all the acts, words, and votes of those who heard and decided upon the matters charged in the complaint originally, or upon appeal, were qualifiedly privileged, if they who complained and acted thereon believed the matters charged to be true." 76 N.J.L., at page 321.
See also Ramsdell v. Pennsylvania R. Co., 79 N.J.L. 379 (Sup. Ct. 1910); Commonwealth v. Shipherd, 157 Pa. Super. 27, 41 A.2d 429 (Super. Ct. 1945); Annotation, 20 A.L.R.2d 421, 474; id., 20 A.L.R.2d 531, 575 (1951).
When such privilege applies, liability for defamatory statements comes into being only where the publication is not made in good faith; where there is express malice or absence of belief in the truth thereof; or where they are motivated by a desire other than to carry out the company's right of discipline in good faith. Hartley v. Newark Morning Ledger Co., 134 N.J.L. 217 (E. & A. 1946); Ramsdell v. Pennsylvania R. Co., supra, 79 N.J.L., at page 381; Butterworth v. Todd, supra; King v. Patterson, 49 N.J.L. 417 (E. & A. 1887). Where there is evidence of these elements, which are primarily subjective in character, the case must be submitted to the jury. Finkelstein v. Geismar, 91 N.J.L. 46, 48 (Sup. Ct. 1917), affirmed on opinion below 92 N.J.L. 251 (E. & A. 1918).
Study of the various letters, notices, the matter of the reading of the charges at the hearings and the proof as to the extent of their publication leaves us convinced that on that aspect of the claim there was no abuse or excessive use of the privilege. The origin, pursuit and conclusion of the *346 grievance proceedings seem to have been engaged in with a minimum amount of dissemination of the charge. Only those persons who might be expected under the bargaining contract to have a justifiable or obligatory interest therein were made aware of the alleged libel by the defendant.
A more serious problem remains. Was the charge published in good faith; without express malice and with a reasonable belief in its truth?
In this connection it may be noted that defendant repeated the accusation of theft in the pretrial order in plainer form than was used in the various letters, and the defense of truth was raised. The use of such a plea may be considered an aggravating circumstance where no effort is made to sustain it. Fodor v. Fuchs, 79 N.J.L. 529, 532 (E. & A. 1910).
Furthermore, where one person falsely charges another with the commission of a crime, which is libelous per se, some evidence of express malice arises. Malice of that character means "some motive, actuating the defendant, different from that which prima facie rendered the communication privileged, and being a motive contrary to good morals." Fahr v. Hayes, 50 N.J.L. 275, 279 (Sup. Ct. 1888). As Chief Justice Gummere wrote in Lawless v. Muller, 99 N.J.L. 9, 10 (Sup. Ct. 1923):
"The proof submitted on the part of the plaintiff showed that the charge contained in the affidavit was absolutely untrue. * * * As to the claim that, assuming the statement to be untrue, there was no proof of malice in its making, it goes without saying that, if a man deliberately makes a false statement concerning another, with full knowledge of its untruthfulness at the time he makes it, the conclusion is almost irresistible that he was impelled to do so by a malicious motive. At the close of the plaintiff's case, the question whether the defendant had deliberately and maliciously made a false statement to the collector of internal revenue in charging the plaintiff with having solicited and accepted a bribe was a question for the jury * * *."
As already observed, defendant offered no specific proof as to what it claimed actually took place with reference to the accusation of stealing of the ham on the train on June 16, *347 1953. The principal actors on behalf of the defendant on that occasion, including in particular Ulich who was responsible for the complaint, were not called to assert the truth thereof or even their reasonable belief in its truth.
The transcript of the unsworn statements of these persons as to the train incident at the company trial was received in evidence by consent after the court had indicated its admissibility for the limited purpose of having the jury pass upon the fairness of the trial and as proof on the subject of reasonable or probable cause for the publication of the alleged libel. The court specifically stated during the trial and in his charge to the jury that the transcript was no evidence of the truth of the accusation and was usable only as an item for consideration in mitigation of damages.
The appendix before us does not contain any explanation of the failure to call Ulich and the police officers. At the oral argument counsel said he considered the administrative judgment of guilt and discharge conclusive and so felt that it was not necessary to do so. A colloquy at this trial suggests that the court entertained somewhat the same view, although it was expressed after the defense had rested and so cannot be said to have influenced counsel's course of action. He said:
"Well, the charge was sustained at the railroad trial and the appeal was abandoned. So far as that goes, there would be nothing wrongful in the discharge. * * *."
Later on he said: "I know. But I have no reviewing authority, you see, over the railroad trial." And: "There is no such authority in this court or in the jury in this court to review the substance or the sufficiency of evidence at the railroad trial." And as noted above on the unlawful discharge claim, the issues submitted to the jury were whether Jorgensen was given a fair trial and whether he was discharged in violation of his seniority rights.
If the grievance procedure judgment were conclusive in the sense of a judicial judgment, then on the record here it would incontrovertibly establish a barrier to the defamation *348 claim. But it was not so regarded, and rightly so, we hold, and that cause of action was permitted to be tried out along conventional lines. In this posture of affairs, failure to call the railroad witnesses cannot be excused for that reason.
However, the non-production of these witnesses undoubtedly was responsible for the prejudicial error to be found in the charge. After referring to the plaintiff's version of what occurred on June 16 and the fact that the defendant had not called any witnesses to prove specifically that the company property was in the bag, he charged:
"Now, in that connection, ladies and gentlemen, I charge you now, in law, that there has been no evidence of any kind in the trial of this case of the truth of the charges made, namely, that there was found in the brief case of this plaintiff this piece of company property. * * *.

* * * * * * * *
Now, there is no evidence opposed to that [plaintiff's testimony] called in the case by the defendant Railroad. * * *.

* * * * * * * *
So that as the evidence in this trial stands, there is no truth in the charge that this ham was found in the plaintiff's bag. I dismiss the special defense of truth, and I instruct the jury to ignore it. The defendant has not called any evidence to establish the truth of the charge made against the plaintiff.

* * * * * * * *
* * * But in any case, both by the direct evidence on the plaintiff's side of the case, and by the presumption of law, the falsity of this charge that this man had in his bag a piece of company property has been established. So that that has been proven by the plaintiff." (Emphasis ours.)
We agree that there is little evidence in support of the defense of truth. But it cannot be gainsaid that some is present. Officer Sweeney's testimony already adverted to of his conversation with Jorgensen and the execution of the resignation, plainly establishes inculpatory inferences with respect to the alleged theft. And the grievance trial and abandonment of the appeal cannot be disregarded. Therefore it was erroneous to instruct the jury as a matter of law that the falsity of the charge had been established; that there was no evidence of the truth thereof and that the defense based thereon was to be disregarded.
*349 Accordingly, the objection to the instructions outlined was well taken; the judgment for defamation is reversed and a new trial ordered.
No separate consideration need be given to the slander count. There was one verdict for libel and slander and what has been said about the alleged libel applies with at least equal force to the alleged oral defamation.

III.

FALSE IMPRISONMENT
Defendant contends there is no evidence in the record of unlawful imprisonment which justifies permitting a jury to pass on the claim. We cannot agree.
This cause of action arises from unlawful restraint of a person's freedom of locomotion. Such restraint does not have to be induced by force; threats by conduct or words may be sufficient. As was said in Hebrew v. Pulis, 73 N.J.L. 621, 624 (E. & A. 1906):
"If the words or conduct are such as to induce a reasonable apprehension of force, and the means of coercion are at hand, a person may be as effectually restrained and deprived of liberty as by prison bars."
See also Earl v. Winne, 14 N.J. 119 (1953); Vail v. Pennsylvania R. Co., 103 N.J.L. 213 (Sup. Ct. 1927).
In such cases the existence of legal justification or probable cause for the detention is a crucial element of the defense. Pine v. Okzewski, 112 N.J.L. 429, 432 (E. & A. 1934); Dalton v. Godfrey, 97 N.J.L. 455 (E. & A. 1922); Vladar v. Klopman, 89 N.J.L. 575 (E. & A. 1916).
The truth or falsity of the charge is, of course, germane to the establishment of probable cause. As already shown, the trial court told the jury that falsity has been established conclusively and the subject need not be debated by them. Just as it was error with respect to the defamation charge, in our opinion it improperly prejudiced the defense to this count.
*350 Accordingly, the judgment is reversed and a new trial ordered.
Since the case is to be retried, it may be helpful to bring to the attention of court and counsel the following cases as to the responsibility of an employer in punitive damages for the acts of his servants or agents: Gindin v. Baron, 16 N.J. Super. 1, 7 (App. Div. 1951), earlier appeal 11 N.J. Super. 215 (App. Div. 1951); Zullo v. Central R. Co. of New Jersey, 9 N.J. Super. 49 (App. Div. 1950); Gates v. St. James Operating Co., 122 N.J.L. 610 (Sup. Ct. 1939); Wendelken v. New York S. & W.R. Co., 88 N.J.L. 270 (E. & A. 1913); Heenan v. Horre Coal Co., 113 N.J.L. 388 (E. & A. 1934), affirming 12 N.J. Misc. 263 (Sup. Ct. 1934); Ketchum v. Amsterdam Apartments Co., 94 N.J.L. 7 (Sup. Ct. 1920).
No costs.