45 N.J. Super. 478 (1957)
133 A.2d 34
THOMAS MURPHY, PLAINTIFF-APPELLANT,
v.
JOHNS-MANVILLE PRODUCTS CORPORATION, A CORPORATION OF THE STATE OF DELAWARE, LICENSED TO DO BUSINESS IN THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 18, 1957.
Decided June 18, 1957.
*482 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Seymour Cohen argued the cause for appellant.
Mr. Thomas L. Morrissey argued the cause for respondent (Messrs. Carpenter Bennett, Beggans & Morrissey, attorneys; Mr. Carl S. Kuebler, of counsel; Mr. Morrissey, on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff sued defendant company for libel. He appeals from a judgment for defendant entered in the Superior Court, Law Division, on defendant's motion at the close of all the evidence.

I.
Plaintiff had been employed by defendant as a millwright for eight years, and generally worked the night shift. On Sunday, August 15, 1954, he reported for work at about 11 P.M. He had known since the previous Wednesday or Thursday that a fellow member in the local volunteer fire company wanted him to get some emery cloth and steel brushes for use in connection with painting a fire truck. Defendant had on a few occasions in the past given the fire company odd items of small value, and these had been taken through the plant gate after formal permission asked and received.
The practice in the plant is for employees to draw materials necessary in their work from the company storeroom on requisitions. Although the storeroom is manned by a regular storekeeper on weekday nights, no one is in attendance on Sunday nights, when employees are expected under an honor system to fill out a withdrawal slip. Plaintiff went to the storeroom during his lunch hour at 3:30 A.M., Monday, August 16, and, without filling out a withdrawal slip, took three new wire brushes and put them in his locker, and also 18 sheets of emery cloth which he put in his lunch bag. He had not, as was required, requested permission *483 from any one in authority to take company property out of the plant, even though a supervisor had been present on Thursday and Friday and was readily available at the plant on this weekend. At quitting time, between 7 and 7:30 Monday morning, plaintiff wrapped the brushes in his overalls, took his lunch bag and proceeded to the company gate. He was stopped by one Pascale, chief of plant protection, who called him into the gatehouse and interrogated him. Plaintiff admitted he had taken the company property without permission  an admission repeated during cross-examination. His excuse then, as now, is that he had on previous occasions taken articles for the volunteer fire company without asking permission.
Company Rule 19 provides:
"19. Theft. Any employee who steals, carries away or applies to his own use, without authorization, property of the Company or of other employees shall be discharged. * * *"
This rule was one of the 32 company rules conspicuously posted throughout the plant, as required by the labor agreement then in effect between the company and plaintiff's union. Plaintiff was familiar with these postings. Article XV of the labor agreement not only made express reference to the posting of these rules, but also provided that:
"* * * Refusal or failure to comply with the rules of the Company may be cause for immediate discharge. Any employee discharged shall have the right of immediate appeal to management through Article XI, Step 3 (Complaints and Grievances) and a hearing on the case shall be held within two (2) working days."
Plaintiff admitted that neither company rule 19 nor Article XV of the labor agreement contained language which would authorize him to take company property without prior permission obtained, merely because it was for a volunteer fire department.
Some time before 9 A.M. Monday Pascale informed the company supervisor of industrial relations, Reynolds, of what had transpired at the gatehouse that morning. Reynolds *484 told him to notify plaintiff not to come to work that evening and to report at 9 o'clock the next morning for a hearing. Pascale also informed plant engineer Merrill, head of the department where plaintiff worked, of the incident. Merrill testified that it was he who determined to discharge plaintiff, that being within his jurisdiction, after checking with the personnel department to see if the penalty was consistent with company action in other matters. He apparently did this after consulting with Reynolds, because the latter had authority to act in an advisory capacity where discharge was involved and had decided upon plaintiff's discharge after hearing from Pascale and checking plaintiff's personnel record.
In accordance with Article XV of the labor agreement, the company promptly notified plaintiff's union representatives and arranged with them for a hearing on plaintiff's discharge to be held the following day, August 17. Union president Shuleski notified plaintiff, who appeared at the hearing and participated in the discussion of his discharge. In addition to plaintiff, there were three union and five management representatives at the meeting. The original notes of the meeting reveal that plaintiff said he should have asked Pascale for permission to take the brushes and emery paper out of the plant; "There was always someone around, but in this case there wasn't [parenthetically, the record shows a supervisor was in the plant, readily reachable  as plaintiff knew  through the gatehouse guard] and he didn't think it was necessary to ask for permission inasmuch as the material was for his own use." He stated: "I admit I was wrong. I should have asked for the taking. I have a disability to my hand and can't get another job." Shuleski asked if the discharge could be reduced to a lesser penalty. Reyonlds replied that it could not in view of company policy, but said that the company would take the matter under consideration.
After the longhand notes had been transcribed, they were turned over to Reynolds who put the minutes of the meeting in the form in which they ultimately appeared and sent *485 five mimeographed copies to union president Shuleski and 13 copies to management personnel. The entire claim of libel in the second count of the complaint rests upon the following statement of defendant concerning plaintiff, appearing in paragraph IV of the minutes:
"The Company stated that it felt that in view of the fact that the employee had taken Company property out of the plant, it had no other recourse but discharge."
The first count of the complaint is based on the letter sent by defendant to union president Shuleski on August 24, 1954, reading:
"After due consideration, the Company wishes to inform you that they uphold the discharge of Thomas Murphy, clock No. 14613, for theft.
This decision was reached after reviewing the facts as presented in our grievance meeting discussing the discharge of Mr. Murphy, on August 17, 1954.
 Very truly yours,
 S.J. Reynolds,
 Supervisor, Industrial Relations."

II.
The first count of the complaint alleges by way of innuendo that defendant, by its August 24 letter, charged plaintiff with having committed the crime of larceny, which charge was malicious and false, and a subterfuge to justify the discharge. The actual motive, it is charged, was plaintiff's refusal to accept defendant's offer of settlement for an injury he had suffered in January 1954 while in defendant's employ, the claim petition being filed in April 1954. (The settlement offered was $2,070 for orthopedic injury to the left hand; the claim was eventually settled without contest, and formalized by judgment of $2,910, of which $2,415 was for the orthopedic injury and $495 for neurological disability. The judgment included an award of counsel fee of $525, allowed after the company had agreed to withdraw its original settlement offer so that such a fee could be awarded.)
*486 The second count, based upon paragraph IV of the union-management meeting minutes of August 17, 1954, alleges by way of innuendo that defendant, by reason of the language it used therein, meant that plaintiff had committed the crime of larceny; that this charge was malicious and false; and that publication of the minutes was maliciously made as a subterfuge to justify plaintiff's discharge, the actual motive being the compensation matter.
By way of defenses to the first count, the company answer alleges that in writing to Shuleski it did so wholly without malice and in good faith; that there was no publication, the letter was a privileged communication, and its contents were true. As to the second count, the separate defenses were that the minutes were not published maliciously and had not been sent to any one other than the union and company representatives; that the minutes were a privileged communication, and true in fact.
One of the witnesses called by plaintiff was defendant's safety engineer Sheckler, in charge of processing compensation claims, whose immediate superior in this work was one Stanton. He testified as to the details of plaintiff's claim for his hand injury, the company's offer of settlement and its rejection, and the eventual settlement without hearing. The trial court admitted the testimony, subject to its being connected up to the alleged libel. It was eventually stricken on defendant's motion, the court stating:
"It is elemental that evidence cannot in any way be presented to a jury upon which they could reach a conclusion merely by speculation. The evidence, as it has now been presented to the Court, at least as it impresses this Court, has no connection or relation to the act of the defendant as claimed in the instant case of libel. I cannot find that there is any reasonable inferences that may be drawn from such evidence that might relate to punitive damages, that is, malice on the part of the defendant, in connection with this one phase of it, namely the workmen's compensation claim of the plaintiff; neither is there any circumstantial proof which would so connect.
The evidence adduced by the plaintiff now clearly contains a categorical denial that the pending compensation claim had anything to do with the severance of the plaintiff from his employment. *487 The testimony further clearly indicates, as now before the Court, that the action of severance was effected before there was any conversation relative to a compensation claim of the plaintiff."
At the close of the entire testimony the trial court denied plaintiff's motion to strike the defenses of qualified privilege. As to the letter which Reynolds sent union president Shuleski on behalf of the company, the trial court held that the proofs strongly established that defendant's conduct was dictated by its duty under the union agreement to give the union written advice of its decision to discharge plaintiff. We shall refer to this requirement shortly. As to the minutes of the union-management meeting, the court held that they "were clearly sent to individuals who necessarily had a right to receive the same in order that they might properly discharge, so far as the union representatives were concerned, the duties imposed upon them under the contract," namely, to request arbitration on behalf of the discharged employee; and that the others who received copies of the minutes were either present at the hearing "or they were connected in such a way with the defendant corporation that it was only reasonable and proper that they should be advised as to what took place at that hearing."
Defendant had moved at the close of plaintiff's case for involuntary dismissal of the complaint. The court reserved decision on the motion, and it was renewed at the close of the entire case. As to the letter, defendant argued that the essential element of publication was lacking; the letter was qualifiedly privileged, there was no proof of malice, and the letter was truthful. As to the minutes, defendant contended that they were truthful, since they contained nothing more than what plaintiff had testified to at the trial; they were qualifiedly privileged, and there was no proof of malice. In granting the motion the trial court held that the letter was not published, no malice was shown, it was qualifiedly privileged, and its contents were true; and as for the minutes, they were true and in accord with plaintiff's own sworn testimony.

*488 III.
On this appeal plaintiff argues that (1) the statement in the union-management minutes, that he had "taken Company property out of the plant," was libelous per se, as was the statement in the letter to the union president that plaintiff had been discharged for "theft"; (2) the written statements were published; (3) their truth was a factual issue to be determined by the jury; (4) whether these publications were qualifiedly privileged and whether the privilege had been abused were also fact questions for the jury; and (5) the facts concerning plaintiff's compensation claim against defendant raised a jury question as to express malice and abuse of qualified privilege, so that it was error for the trial court to strike the evidence relating to the claim.
We need not deal with the first of these questions. There can be no dispute with plaintiff's contention that any printed or written statement which falsely and maliciously charges another with the commission of a crime is libelous per se. 33 Am. Jur., Libel and Slander, § 11, p. 44 (1941); 53 C.J.S. Libel and Slander § 53, p. 101 (1948). This clearly includes the express charge of theft. Shaw v. Bender, 90 N.J.L. 147, 149 (E. & A. 1917); 33 Am. Jur., Libel and Slander, § 31, p. 54 (1941); 53 C.J.S., Libel and Slander, § 70, p. 115 (1948), and likewise includes an unavoidable implication that the property was stolen. Jorgensen v. Pennsylvania R. Co., 38 N.J. Super. 317, 343 (App. Div. 1955). It may be said, as defendant does, that the union-management minutes contain nothing more than what plaintiff had freely admitted in the course of the meeting, so that the statement included in paragraph IV quoted above was truthful. There is considerable merit to this, but we do not pass upon the point. Nor do we decide that the use of the word "theft" in the letter to Shuleski was not libelous because truthful. Here defendant urges that the reference to "theft" was to that word as defined in company rule 19 which we have quoted. But we may *489 observe that here, as in other contexts, the word implies "theft as common thought and common speech would now image and describe it." Van Vechten v. American Eagle Fire Ins. Co., 239 N.Y. 303, 146 N.E. 432, 38 A.L.R. 1115 (Ct. App. 1925).

IV.
Nor need we consider at any length whether there was publication. The distribution of 18 copies of the minutes undoubtedly constituted publication. However, defendant contends that the letter sent to union president Shuleski on August 24, 1954 was in legal essence a communication to plaintiff himself, since Shuleski was actually his agent. Defendant points out that plaintiff was a dues-paying member of the union, the union was duly certified by the National Labor Relations Board as the collective bargaining representative of plaintiff and other employees of defendant, and there was no testimony that any one else saw the letter. Extensive reference is made to sections 2(13), 7, 8(a)(1) and (5), and 9(a) of the Labor Management Relations Act of 1947, as amended, 61 Stat. 136, 29 U.S.C. § 151 et seq., which requires defendant to deal with the union whenever a question arises concerning an employee's condition of employment.
In its brief defendant contends that although there is some minority view to the contrary, the general rule at common law is that the communication of allegedly libelous matter to an agent acting within the scope of his agency does not constitute a publication, citing 33 Am. Jur., Libel and Slander, § 109, p. 112 (1941); McDaniel v. Crescent Motors, Inc., 249 Ala. 330, 31 So.2d 343, 172 A.L.R. 204 (Sup. Ct. 1947) (communication to president of plaintiff's union). There is responsible authority to the contrary. See Restatement of Torts, § 577, comment e, p. 194 (1938); Prosser, Law of Torts (2d ed. 1955), § 94, p. 597; 1 Harper and James, Law of Torts, § 5.15, p. 393 (1956). All of these authorities, however, point out that the communication *490 may be privileged, depending upon the circumstances. The determination as to whether the communication has been published is not a matter of idle import, even if it be found that the communication was qualifiedly privileged, since a qualified privilege must be exercised in good faith. On the other hand, if there is no publication, the matter of good faith is, of course, not even reached. Were it necessary to decide whether there was publication of the letter, we would follow the rule of the Restatement and of the other authorities mentioned, for the capacity of a libelous statement to subject the reputation of the person defamed to injury is not eliminated, though it may be neutralized, by the circumstance that the publication was to his agent.

V.
Having passed the issues raised as to the truth and publication of the minutes and the letter, we arrive at a determination of the critical issues of qualified privilege and good faith.
As to qualified privilege, the evidence overwhelmingly establishes the justification for the ruling of the trial court that there was no genuine factual issue. It is, of course, settled that in the absence of any material dispute as to facts, the question of whether the factual situation raises a case of qualified privilege is a matter of law for the courts. Prosser, Law of Torts (2d ed. 1955), § 95, p. 629.
We deal first with the distribution of the union-management minutes. Plaintiff for the first time at the oral argument took the position that he was in no way chargeable with what happened at the meeting of August 17 or with any of the consequences of that meeting, because he did not ask for it. There is no merit in the contention. Plaintiff was a union member and bound by the provisions of the existing labor agreement involving situations like his. Article XI of the agreement deals with complaints and grievances and provides that in the adjustment of such matters the union shall be represented by a shop committee of five member *491 employees. Article XV, quoted above, deals with company rules and provides that refusal or failure to comply with such rules may be cause for immediate discharge, but any discharged employee "shall have the right of immediate appeal to management through Article XI, Step 3," the hearing to be held within two working days. True, it does not appear that there was a formal appeal by plaintiff from his discharge, or that he was clearly notified he was discharged until he appeared at the meeting. But the union president notified him to appear at that meeting, he did appear (as did the union shop committee), and the record is clear that he took advantage of the opportunity to speak in his own justification. He and the union committee therefore regarded the meeting as being to all intents and purposes an occasion for him to make such representations to management as might dissuade the company from discharging him. Thus, by ratification by both sides to the controversy, the parties themselves constituted this meeting as an occasion for hearing the subject matter of the complaint against plaintiff, with a view toward reconsideration and final determination of the matter by the company thereafter. Plaintiff may not now contend that the meeting and its sequel were not, procedurally, with his concurrence.
Defendant's industrial relations manager, Naylor, who prescribed the dissemination of the minutes, testified that it was a practice of many years' standing to send five copies of grievance meeting minutes to the union, and this was done to accommodate the labor agreement provision that the union have a five-man committee on grievances. He also testified in some detail as to why 13 copies were distributed to various representatives of management. In the considered opinion of management, each of the persons who received a copy needed to have this information either because his job required that he keep abreast of the handling of labor relations problems such as the one involving plaintiff or, if he participated in the meeting, in order that he might have a record of what transpired. Naylor summarized his testimony by stating that this distribution was prescribed in *492 order to have uniform procedures and policies throughout the company in the administration of the labor agreement.
It is the common law and the law of this State that "a communication, made bona fide, upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contain criminatory matter which, without this privilege, would be actionable." Rothholz v. Dunkle, 53 N.J.L. 438, 440 (E. & A. 1891), quoting from King v. Patterson, 49 N.J.L. 417 (E. & A. 1887). The court in Finkelstein v. Geismar, 91 N.J.L. 46, 48 (Sup. Ct. 1917), affirmed 92 N.J.L. 251 (E. & A. 1918), put the rule this way:
"A communication is qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do."
The application of the rule of qualified privilege has been analyzed in a number of decisions by our courts, among them Butterworth v. Todd, 76 N.J.L. 317 (Sup. Ct. 1908); Ramsdell v. Pennsylvania R. Co., 79 N.J.L. 379 (Sup. Ct. 1910); and, most recently, Jorgensen v. Pennsylvania R. Co., above, 38 N.J. Super. 317, 343 ff. (App. Div. 1955). See, also, Prosser, Law of Torts (2d ed. 1955), § 95, p. 614 ff.; 33 Am. Jur., Libel and Slander, §§ 126, 171, pp. 124, 166 (1941); 53 C.J.S. Libel and Slander §§ 89 et seq., 107, pp. 143 et seq., 184 (1948). As to statements to labor union representatives, see Annotation, 172 A.L.R. 208, 220; and Jorgensen v. Pennsylvania R. Co., above, 38 N.J. Super., at page 343 et seq., a case very similar to this one.
Plaintiff claims that the qualified privilege was abused; it cannot extend to disclosure to all of the 18 persons who received copies of the minutes. However, once the existence of the privilege is established, the burden is on plaintiff to prove it has been abused by excessive publication, *493 either by use of the occasion for an improper purpose, or by lack of belief or grounds for belief in the truth of what was said. Prosser on Torts (2d ed. 1955), § 95, p. 629. There was no proof forthcoming to show that the publication, which was entirely within the defendant corporation and the union group, exceeded the bounds of its qualified privilege. It is entirely clear to us that all of the people to whom copies of the minutes were sent had a sufficient interest in the matter, from the standpoint of the company and union-management relations, as to make the communication not only qualifiedly privileged, but its distribution well within reason, as a matter of law.
It is even easier to arrive at the same conclusion with respect to the letter sent by defendant to the union president advising him of its final decision with respect to plaintiff. It was defendant's obligation so to inform the union under Article XI of the labor agreement, which required that the written decision on a grievance considered at a union-management meeting "shall be final and unappealable to Step 4 [appeal to a board of arbitration] unless appealed in writing within one (1) week from date such decision is given to the union under Step 3." (Italics ours) The letter was nothing more than a definite appraisal of the union president as to the company's decision. (It may incidentally be noted that after his discharge plaintiff asked the union to take the matter to arbitration, but it refused to do so. Thereafter, he brought an action against the company to compel them to arbitrate the grievance; the union intervened and resisted the arbitration, and the action was dismissed.)
In connection with the letter sent the union, it is appropriate to refer to the Jorgensen case, already cited, where in quite similar circumstances the court said:
"Having in mind the statutory background and the collective bargaining agreement produced thereby, we have no hesitancy in holding that a qualified privilege existed in the case at bar. When Jorgensen and his attorney demanded the trial, the company was under an obligation to grant it. And when the notices of the hearing and *494 the result thereof were issued, the statement of the charge to be tried was entitled to the benefit of the privilege." (38 N.J. Super., at page 344)

VI.
This brings us to plaintiff's final claim that the qualifiedly privileged character of the communications was destroyed because of the existence of express malice. He points to the alleged difficulty in settling his workmen's compensation claim as of sufficient moment to raise a factual issue for the jury as to the presence of good faith and the absence of malice in the company's exercise of the qualified privilege.
Plaintiff relies upon the fact that Reynolds, who concurred in the decision to discharge him, advised safety supervisor Stanton, who was under Reynolds' supervision and had over-all charge of all matters involving compensation claims, that plaintiff had been discharged. This happened some time on the morning of August 16, after Reynolds had decided to discharge plaintiff. We are asked, as was the trial court, to draw the inference that the company was so displeased by plaintiff's refusal to accept its offer of settlement of his claim some ten days before, that it was looking for an excuse to discharge him, and the discharge and consequent libel were motivated partly by that consideration. Reynolds testified he called Stanton because the plant guard who had stopped plaintiff coming out with the brushes and emery paper had, at the time he told him of plaintiff's violation, also mentioned that plaintiff had previously been injured. Reynolds said he thought the company officer in charge of claims should know they were going to discharge plaintiff, in case there was a claim, and that this was purely as a matter of information, it being company policy to keep every one who might be concerned informed. He further stated that the claim had no bearing whatsoever on his decision to discharge plaintiff.
It has been said that express malice, in a setting like the one here at hand, means "some motive, actuating the defendant, different from that which prima facie rendered *495 the communication privileged, and being a motive contrary to good morals," and that plaintiff has the burden of proving such express malice. Fahr v. Hayes, 50 N.J.L. 275, 279 (Sup. Ct. 1888). Prosser points out (op. cit., § 95, pp. 627-8) that "malice" in the law of defamation "means something more than the fictitious `legal malice' which is `implied' as a disguise for strict liability in any case of unprivileged defamation." Even if a defendant feels indignation and resentment toward a plaintiff, he will not always forfeit his qualified privilege, citing, among other authorities, the Fahr case. See also, Evans, "Legal Immunity for Defamation," 24 Minn. L. Rev. 607, 610 (1940). The statement which best fits the decided cases is that the court will look to the primary motive or purpose by which the defendant apparently was inspired. Prosser would discard "malice" as a "meaningless and quite unsatisfactory term"; the privilege is lost if the publication "is not made primarily for the purpose of furthering the interest which is entitled to protection." Accord: Restatement, Torts, § 603 (1938).
We will not indulge plaintiff his fancy that defendant was so irritated at his rejection of the compensation settlement that it was moved to discharge him on the slightest pretext. On the record before us, such inference could be based upon nothing more than suspicion. As the trial court put it, the jury could find express malice only if it resorted to speculation. There is not an iota of specific testimony which would directly justify the inference plaintiff seeks to have the court draw from the phone call made by Reynolds to Stanton  a call which was quite satisfactorily explained and entirely natural in the circumstances. The plaintiff himself  as the trial judge noted  adduced evidence containing a clear and categorical denial that the pending compensation claim had anything to do with his discharge.
Where the case is clearly or admittedly one of qualified privilege, and there is no evidence, or not more than a scintilla of evidence, of malice, it is the duty of the trial judge to withdraw that issue from the consideration *496 of the jury. Prosser on Torts (2d ed. 1955), § 95, p. 629; Odgers on Libel and Slander (5th ed. 1911), pp. 688, 691; Seelman, Law of Libel and Slander (1941), p. 272; 33 Am. Jur., Libel and Slander, § 272, p. 255 (1941). Accord, Domchick v. Greenbelt Consumer Services, Inc., 200 Md. 36, 87 A.2d 831 (Ct. App. 1952); Charles Parker Co. v. Silver City Crystal Co., 142 Conn. 605, 116 A.2d 440 (Sup. Ct. Err. 1955). The evidence upon which plaintiff relies to establish express malice constitutes no more than a scintilla, if that, so that the trial judge was entirely right in concluding that a jury issue was not present.
Judgment affirmed.