152 N.J. Super. 133 (1977)
377 A.2d 807
ANDREW ROGOZINSKI AND GINGER ROGOZINSKI, HIS WIFE, PLAINTIFFS,
v.
AIRSTREAM BY ANGELL AND EMMETT ANGELL, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 18, 1977.
*137 Mr. Donald W. Morrow for plaintiff (Messrs. Morrow & Benbrook, attorneys).
Mr. J. Douglas Orr for defendants.
BEETEL, J.C.C., Temporarily Assigned.
This is a suit by a former employee for breach of employment contract and by the same employee and by his wife (also employed but without an employment contract), for defamation arising from letters written to the Unemployment Compensation Commission pursuant to a request for separation information.
Plaintiff Andrew Rogozinski sued Airstream by Angell, Inc. and Emmett Angell, its president, in a three-count complaint. In the first count he sued for breach of employment contract. By the second count he charged defamation resulting from a letter written by Emmett Angell in response to a request for separation information by the Unemployment Compensation Commission. In the third count plaintiff Ginger Rogozinski sued Emmett Angell for libel arising from a similar letter written to the Unemployment Compensation *138 Commission pursuant to a request for separation information as to her.[1]
Defendant claims that the dismissal of Andrew Rogozinski was justified and that the letters written to the Unemployment Compensation Commission were not defamatory, or at least that the truth constitutes the defense or that the public duty to give such information provides a privilege.
Defendant's proofs centered around the damage allegedly done to the Service Department and Body Department by Andrew Rogozinski and in the Parts Department by Ginger Rogozinski during their tenure in these respective posts. Andrew Rogozinski allegedly handled customers and employees badly, failed to return warranty parts to Airstream's insurance carrier, Caravan Insurance Company, for credit and failed to complete paper work for the purpose of obtaining reimbursement for insurance repair work. Andrew Rogozinski offered conflicting proofs.
Defendant alleged that Ginger Rogozinski caused a drop in sales during her operations, but this, it was shown, was based largely upon data that was incomplete for the period during which she was in charge of the Parts Department. Indeed, she testified convincingly that she was merely laid off for financial reasons. She was not immediately replaced.
At trial there were no proofs of personal liability on the part of Emmett Angell. In addition, Airstream By Angell was found to be a corporation of the State of New Jersey, and consequently all liability for a breach of contract or libel arising in the scope of employment of Emmett Angell would relieve him of individual liability. This court finds that Emmett Angell is not individually liable. Defendant Airstream By Angell, Inc. denied liability for breach of contract and for libel on all counts. In addition, defendant counterclaimed for interference with contract and business advantage. At trial there was no evidence of interference with *139 contract or with business, and although Andrew Rogozinski admittedly removed certain records from premises upon departure for the purpose of obtaining certain payments allegedly due under contract, defendant counterclaimant offered no proof that these records had any substantial effect on business. The counterclaim is therefore dismissed.
Plaintiff Andrew Rogozinski had been an employee of the manufacturer of Airstream Trailer associated companies since at least 1971. At one time he had been employed for the purpose of visiting various dealers to encourage the use of a flat-rate manual he had written for Airstream's insurance carrier, Caravan Insurance Company. Immediately prior to his employment by defendant, Andrew Rogozinski had been employed by May Trailer Sales, Irving, Texas, where he ran three service departments. May Trailer Sales gave up its franchise in 1974 and plaintiff called various Airstream dealers seeking work. He called Emmett Angell in October 1974 by phone. In early December 1974 he went to Bloomsbury, New Jersey, the place of business of Airstream By Angell, Inc., and employment was agreed upon. The original employment salary was agreed upon at $2,000 a month for husband and wife. The husband was to be in charge of the Service Department, parts and store. Andrew Rogozinski was to receive $1,500 of the $2,000 and Ginger Rogozinski $500 a month. The $1,500 a month was memorialized in a written contract dated December 23, 1974. Prior to beginning actual employment Andrew Rogozinski arranged for the disposition of certain glass possessed by defendant for an agreed-upon commission of 20% of the wholesale price. In the contract December 16, 1974 was listed as the date of employment, although Andrew Rogozinski admits he did not start until January. This additional payment of salary was compensation for the unliquidated claim regarding the glass. No further reference will be made to the glass incident.
In May or June 1975 John Angell, brother of Emmett Angell and former owner of Airstream By Angell, Inc., came into Airstream by Angell, Inc. as a Service Manager. On *140 July 28, 1975 a written agreement was produced which assigned Andrew Rogozinski to the Body Shop only. The agreement provides for Andrew Rogozinski to receive 50% of labor and 10% of parts as a commission. By separate agreement two-thirds of the labor commission went to Andrew Rogozinski and the other one-third to Vern Ainslee, Andrew's employee. Basic compensation was paid as a $320 draw to Andrew Rogozinski and a $160 draw to Vern Ainslee. In no case would the draw exceed 80% of the amount credited.
Andrew Rogozinski was terminated by Emmett Angell on September 2, 1975. Ginger Rogozinski was terminated the same day. Andrew and Ginger applied for unemployment compensation on September 15, 1975 and September 16, 1975, respectively. The Unemployment Compensation Commission sent Airstream by Angell, Inc. a request for wage and separation information on Form BC-2. Block 15, "Information Required," contains Item I, a reason for separation. Two blocks are provided: one, "Lack of Work" and the other, "Other (Explain in detail, continue on reverse side if necessary)." Several lines are then provided. Regarding Ginger Rogozinski, Emmett Angell checked "Other" and wrote on the BC-2 Form: "A drastic reduction in the sales in the store from the time she took that job indicated a lack of capability on her part to adequately accomplish the tasks at hand." Regarding Andrew Rogozinski, Angell checked "Other" and wrote "Discharge for Cause (see letter of this date)." Angell wrote the following in an accompanying letter:
Mr. Rogozinski was dismissed for a cause so serious as to affect the company's integrity in the industry as well as its relationship with its current service customers and suppliers.
Since his hiring he has been progressively reduced from a position of higher responsibility to one of little responsibility. He continued to antagonize both our customers and our employees. He had to be continually watched and reminded with respect to collection of monies, ordering of parts and supplies, and treatment of customers. In sum, we could no longer depend upon him to represent our best interests.
*141 This letter was written to the Unemployment Insurance Claims Office and testimony indicates that, pursuant to the statutory confidentiality provided by N.J.S.A. 43:21-11(g), it could be expected to be read only by Unemployment Compensation Commission personnel and those of seven or eight other government agencies for official purposes only. No evidence of further publication of the letters was offered at trial.
Following his dismissal Andrew Rogozinski sought other work, utilizing his prior connections in the Airstream distribution system. He apparently concentrated on opportunities outside New Jersey because of his perception of the influence of Emmett Angell in the immediate area. He claimed that he sought work as a service manager at various Airstream dealerships, but the defendant offered testimony that Andrew was not seeking to mitigate damages by looking into the same type job but was in fact seeking an Airstream franchise. Considering the proofs, it is not inconceivable that Andrew Rogozinski was seeking either or both. This court concludes that Andrew did attempt to mitigate damages. Considering his experience and his difficulty in obtaining work as a service manager, his seeking a franchise was not, as a matter of law, an inappropriate method of mitigating damages. At best, defendant's proofs on this subject showed that of the trips undertaken by Andrew Rogozinski in seeking work, only one was clearly a franchise-seeking excursion.
Andrew Rogozinski incurred expenses totalling $3,758.97 during trips associated with seeking work. He was unable to obtain work until April 10, 1976, when he obtained his present employment at Orlando Travel Center, Orlando, Florida. This job pays $250 a week. Andrew claims wage losses of at least $320 a week, less $250 a week after April 10, 1976.

I. Perpetual Contract
Andrew Rogozinski claims that his July 28 contract provided for employment "in perpetuity," and therefore seeks *142 damages for breach of this "perpetual" contract. Although that language was used by Rogozinski, who prepared the contract, Emmett Angell's testimony nevertheless indicates that he was aware of the existence and significance of the terms used. The prospect of perpetuity comported with Airstream By Angell, Inc.'s expectations and with defendant Emmett Angell's, if Rogozinski's work proved satisfactory.
It should be noted that the contract does not provide for permanent employment per se, but only for a "perpetual" contract. The inference might be drawn that the "perpetual" aspect of the agreement relates only to the unchanging nature of the terms of the contract and not with the term of employment. Emmett Angell's testimony, however, indicates that this perpetual aspect related, in his mind, to the term, not the perpetual nature of the terms.
Corbin on Contracts, § 684 at 228, provides:
Sometimes there is a promise of "permanent employment." The quoted word is a strong one; but it does not mean employment forever or employment for life. When it is used, the court should usually find that the employment was not intended to be terminable at will; but whether there is a contract for a definite period must depend upon accompanying factors.
In Savarese v. Pyrene Mfg. Co., 9 N.J. 595 (1952), the court recited the prevailing rule as follows:
* * * In the absence of additional express or implied stipulations as to duration, a contract for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and therefore, a discharge without cause does not constitute a breach of such contract justifying recovery of money damages therefor.
However, the court continues:
Where the employee has given consideration additional to the services incident to the employment, or, as it is sometimes stated, where the employee purchases the employment, in the absence of a *143 statute, other terms in the contract, or circumstances to the contrary, the contract for permanent employment, for life employment, or for other terms purporting permanent employment, is valid and enforceable and not against public policy, and continues to operate as long as the employer remains in the business and has work for the employee, and the employee is able and willing to do his work satisfactorily and does not give good cause for his discharge, a discharge without cause constituting a breach of such contract entitling the employee to recover damages therefor

* * * * * * * *
Deeming them to be at variance with general usage and sound policy, the courts have shown a marked reluctance to enforce contracts for life employment.

* * * * * * * *
Agreements of this nature have not been upheld except where it most convincingly appears it was the intent of the parties to enter into such long-range commitments and they must be clearly, specifically and definitely expressed. [at 600-601]
The court went on to hold that a corporate officer's statement, "You will have a foreman's job for the rest of your life," partook more of the nature of a "friendly assurance of employment" than of a binding contract for life employment.
Shiddell v. Electro Rust-Proofing Corp., 34 N.J. Super. 278 (App. Div. 1954), reviews the Savarese decision and concludes that although these contracts are difficult to prove, they are not unenforceable or against public policy. The court concluded that, under the circumstances before it, wherein allegations, if proven, "would most convincingly establish clearly, specifically and definitely that it was the intent of the parties to enter into long-term commitments," and that the plaintiff may have "purchased his employment," summary judgment in favor of the employer was inappropriate.
In the instant case the contract, by its terms, indicates that the clearly expressed intention of the parties contemplated permanent employment. More importantly, the surrounding circumstances indicate that, at least as to the second contract, there was an equality of bargaining power and a considerable sacrifice of important economic advantage *144 in the substitution of body shop duties for those of the service manager. By testimony from both sides it appears that the change in positions entailed substantial risk to Andrew Rogozinski but offered substantial returns as well, had Rogozinski been permitted to remain and build up this aspect of the business.
The sacrifices and risks entailed and the equality of bargaining power which accompanied the contract and perpetuity were within the contemplation of the parties and fully enforceable.
It further appears that defendant breached the contract by discharging Rogozinski without adequate cause. The reasons given were the subject of conflicting proofs, but seem to have been largely related to the personal animosity as opposed to the incompetence or ineffectiveness in performing the assigned functions. Both sides criticized the other's haphazard business methods. Considering the exceedingly short duration of the actual employment in the body shop, it is impossible to conclude that defendant was justified in discharging Andrew Rogozinski.
As to damages, Savarese speaks in terms of a perpetual contract operating "as long as the employer remains in the business and has work for the employee, and the employee is able and willing to do his work satisfactorily and does not give good cause for his discharge."
Finding a perpetual contract does not require that plaintiff be given an annuity for his breach. The Savarese analysis contains an implication of a reasonable time limit on damages. Here it is to be noted that the contract itself contains a provision for a vacation, which contemplates various vacation periods stabilizing after the second year. A reasonable time limit for the instant contract, therefore, which would seem to fulfill the expectations of the parties at the time of making the contract, would be two years, and consequential damages as proven at trial to be $3,758.97. Compare Esslinger's, Inc. v. Alachnowicz, 68 N.J. Super. 339 (App. Div. 1961).

*145 II. Defamatory Statements

The statement regarding Ginger Rogozinski relates to her ability to perform her trade or business  that of operating a parts department  and could be regarded as libelous per se under common law. Sokolay v. Edlin, 65 N.J. Super. 112 (App. Div. 1958); Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. 420 (App. Div. 1958), op. adhered to, 49 N.J. Super. 551 (App. Div. 1958). The communication concerning Andrew Rogozinski, who was shown at trial to be argumentative and possibly nonproductive could, nevertheless, be similarly categorized. Further, this letter contains an implication of criminality, although slight. "He had to be continually watched and reminded with respect to the collection of monies, ordering of parts and supplies, and treatment of customers." Thus, the statement as to Andrew Rogozinski may be libelous per se under common law relating both to his trade or business and as containing an implication of criminality, otherwise unexplained. Jorgensen v. Pennsylvania R.R. Co., 38 N.J. Super. 317 (App. Div. 1955), 25 N.J. 541 (1958); Murphy v. Johns-Manville Products Corp., 45 N.J. Super. 478 (App. Div. 1957); Ramsdell v. Pennsylvania R. Co., 79 N.J.L. 379 (Sup. Ct. 1910).
Restatement, Torts 2d, § 580B, now provides:
One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
(a) knows that the statement is false and that it defames the other,
(b) acts in reckless disregard of these matters, or
(c) acts negligently in failing to ascertain them.
Comment C to this section, "Effect of the Constitution," provides:
*146 In Gertz v. Robert Welch, Inc., 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed.2d 789] (1974), the Supreme Court specifically held that the First Amendment to the Constitution does not permit the imposition of "liability without fault" on "a publisher or broadcaster of defamatory falsehood injurious to a private individual". Aside from this restriction, the Court said, the States may define for themselves "the appropriate standard of liability". The strict liability of the common law has thus been expressly ruled unconstitutional. A significant measure of fault on the part of the defendant in regard to the falsity of the communication is required. Obviously, knowledge of falsity or reckless disregard as to it is sufficient. It is clear that negligence will likewise meet the constitutional requirement, although a lesser degree of fault probably would not. In view of the constrained change from the common law strict liability, it is natural to conclude that the revised common law rule of defamation will be that a defendant is liable either for negligence or for some greater fault.
In Barbetta Agency, Inc. v. Evening News Pub. Co., 135 N.J. Super. 214 (App. Div. 1975), the court assumed, without deciding, that Gertz applied with equal force to private as well as media defendants. This court makes the same assumption.
In the instant case defendant alleges that the statements made regarding both plaintiffs were true. An analysis of all applicable cases leads this court to conclude that truth may persist as a defense after Gertz.
Prosser, Law of Torts (4 ed. 1971), § 116 "Other Defenses: Truth," indicates:
The defense that a defamatory statement is true has been given the technical name of justification * * * [T]ruth was a defense to any civil action for either libel or slander and remains so in a great majority of jurisdictions. It is immaterial that the defendant published facts for no good reason or for the worst possible motives, or even that he did not believe at the time that they were true. * * *
Out of a tender regard for reputations, the law presumes in the first instance that all defamation is false and the defendant has the burden of pleading and proving its truth. Its justification must be as broad and as narrow as the defamatory imputation itself. He may not avoid liability by proving that the imputation was true in part, or, if the charge is one of persistent misconduct, by showing that it was true in any single instance. [at 796-98; footnotes omitted]
*147 Comment J to the Restatement, § 580B, indicates under burden of proof as to fault, that
* * * there remains little, if any, significance in the common law position that the truth in this statement is the defense to be raised by the defendant and on which he has the burden of proof. * * * As a practical matter, in order to meet constitutional obligation of showing defendant's fault as to truth or falsity, the plaintiff will necessarily find that he must show the falsity of the defamatory communication.
Substantively, however, truth as the defense persists after Gertz. Compare Dacey v. Connecticut Bar Ass'n, 170 Conn. 520, 368 A.2d 125 (Sup. Ct. 1976). Similarly, in Hotchner v. Castillo-Puche, 551 F.2d 910 (2 Cir.1977), the court held (at 913) that "an assertion that cannot be proved false cannot be held libelous. A writer cannot be sued for simply expressing his opinion of another person however unreasonable is the opinion or vituperous the expressing of it may be." See also, Kapiloff v. Dunn, 27 Md. App. 514, 343 A.2d 251, 263 (Ct. App. 1975), cert. den. 426 U.S. 907, 96 S.Ct. 2228, 48 L.Ed.2d 832 (1976). In Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1974), Powell, J., concurring states:
Today's opinion reiterates what we previously have recognized, see Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964)  that the defense of truth is constitutionally required when the subject of the alleged defamation is a public figure. [420 U.S. at 498, 95 S.Ct. at 1048, 43 L.Ed.2d at 351]
Although Gertz apparently denies the court the right to presume damages, the presumption that a defamatory statement is false is not changed. Further, in the instant case the justification offered by defendant was not as broad as the defamatory imputation itself. Defendant's proofs were inadequate to justify the patent errors regarding Ginger Rogozinski's performance contained in the letter regarding her, nor the implication of criminality contained in the letter regarding Andrew Rogozinski.
*148 Having failed to justify the letters on the basis of truth, defendant must show that the letters were in some way privileged.
The letters in issue here were written in response to an inquiry from the Unemployment Compensation Commission pursuant to N.J.S.A. 43:21-11, which provides in applicable part:
(g) Records and Reports. * * * The director may, in his discretion, require from any employer or employing unit, reports relative to wages and separation in such manner and at such time as he may deem necessary for the effective administration of this chapter. Information thus obtained shall not be published or be open to the public inspection (other than to public employees in the performance of their public duties) in any manner revealing the employing unit's identity, but any claimant at a hearing before an appeal tribunal, the division or the board of review shall be supplied with information from such records to the extent necessary for the proper presentation of his claim.
N.J.A.C. 12:17-1.2 provides:

Request for Separation or Wage Information.
(a) Upon request by the Division of Employment Security for information with respect to wages or the separation of any worker from an employer or employing unit, such employer or employing unit, shall, within seven calendar days after the date of mailing the form covering such request, complete the form and return it to the unit which initiated the request.
(b) Failure to comply with such requests will subject the defaulting employer to the penalties prescribed in N.J.S.A. 43:21-16(b) (2).[2]
Because N.J.S.A. 43:21-7 provides a benefit experience rating system for employer contribution rates for unemployment compensation for its employees, the employer may be interested in reducing the eligibility of his discharged employee by disqualification of that employee under N.J. *149 S.A. 43:21-5(b), of which refers to disqualification due to misconduct connected with work. In this case the local Unemployment Compensation Commission caseworker claimed that Airstream By Angell, Inc., discharges for misconduct were taken "with a grain of salt," although the record is to devoid of proof of previous fraud in this regard. We cannot conclude that the letters in this case represented fraud and that absent such proof, the letter cannot have been regarded as uttered with any intention other than that of providing the requested information.
Defendant indicates that (1) the letters were issued pursuant to a public duty or (2) in the alternative, that they were the result of consent by plaintiffs and were thereby absolutely privileged.
53 C.J.S. Libel and Slander § 88 at 143 (1948), "Absolute Privilege," states:
An absolutely privileged communication is one for which, by reason of the occasion on which it is made, no remedy is provided for the damages in a civil action for slander or libel.
And § 102, "Absolute Privilege," states:
As discussed in supra Sec. 88, it is well settled that the law recognizes a class of communications so absolutely privileged that even the existence of express malice does not destroy the privilege. The class of occasions where the publication of defamatory matter is absolutely privileged is, however, confined within narrow limits, and the courts as a rule have steadily refused to enlarge those limits

* * * * * * * *
Specifically, it has been said that the cases of absolute privilege are limited to three classes:
(1) Proceedings of legislative bodies.
(2) Judicial proceedings.
(3) Communications By military and naval officers.
Some authorities recognize, in addition to the classes enumerated, a fourth general class, namely, official acts of the state or of the chief executive officers of the state. Furthermore, in some jurisdictions, by force of statute, absolute privilege attaches to official proceedings authorized by law, such as proceedings by a body clothed with quasi-judicial powers sitting in execution of a public duty. If the communication is not pertinent to the occasion, it is not within the privilege. [at 164-66]
*150 In New Jersey absolute privilege is accorded to statements during judicial proceedings, J.D. Const. Corp. v. Izaacs, 51 N.J. 263 (1968); Rainier's Dairies v. Raritan Valley Farms, 19 N.J. 552 (1955); Middlesex Concrete Products and Excavating Corp. v. Carteret Indust. Ass'n, 68 N.J. Super. 85 (App. Div. 1961), and quasi-judicial proceedings, J.D. Construction Co. v. Izaacs, supra; Rainier's Dairies v. Raritan Valley Farms, supra; Genito v. Rabinowitz, 93 N.J. Super. 225 (App. Div. 1966); Fenning v. S.G. Holding Corp., 47 N.J. Super. 110 (App. Div. 1957).
Although made in a mandatory response to a request by the Unemployment Compensation Commission for information, the statements made by defendant herein were not absolutely privileged. No judicial or quasi-judicial proceeding was pending at that time, and defendant herein cannot claim what ever privilege might have been asserted by the Unemployment Compensation Commission itself under the category of "Official Acts of an Executive Body." Compare Cashen v. Spann, 125 N.J. Super. 386 (App. Div. 1973), mod. 66 N.J. 541 (1975), cert. den. 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 46 (1975), wherein the Appellate Division had held that defendant telephone company was not cloaked with the same immunity as the prosecutor under whose subpoena the allegedly defamatory statements were uttered.
In the instant case this court would hold that defendant is not entitled to the same immunity afforded a public officer of he Unemployment Compensation Commission in the discharge of his duties when defendant replies to a request by such public officer for information.[3]
*151 As to consent, Prosser on Torts, § 114, "Absolute Privilege, 4. Consent of the Plaintiff," indicates:
The general social policy of denying recovery for conduct to which the plaintiff has given his consent finds expression in an absolute immunity in cases where consent is given to defamation. One who has himself invited or instigated the publication of defamatory words cannot be heard to complain of the resulting damage to his reputation; and this is true although the publication was procured for the very purpose of decoying the defendant into a lawsuit. At the same time, of course, it is not every request to speak which manifests consent to slander, and an honest inquiry as to what is meant, or an investigation in good faith to find out what the defendant has been saying will not bar the action, even though it is made for the ultimate purpose of vindication at law.
No New Jersey cases have held that defamatory communications made at the instigation of or with the consent of an individual are absolutely privileged per se. However, in Mick v. American Dental Ass'n, 49 N.J. Super. 262 (App. Div. 1958), the court held:
When the publication of defamatory matter has been invited, instigated or procured by one defamed, or by someone acting on his behalf, he generally cannot be heard to complain of the resulting injury, ... particularly, when it is elicited for the purposes of predicating an action thereon ... However, the action would not be barred if the plaintiff, or someone at his request, made or caused the inquiry to be made in good faith so as to ascertain whether defamatory charges had been made against him or perhaps to seek clarification of an ambiguous remark.
The court in Mick went on to hold that the defamation action as to the letter in question was barred by the theory of invitation or consent, at least as to the addressee of the *152 letter  in effect holding that there was no publication. This comports with Annotation, "Communication to an Agent or Representative of a Person Defamed as Publication or as Privileged." 172 A.L.R. 208 (1948):
It is a general rule, in the absence of modifying statutory regulations, and subject to some exceptions, that the communication of libelous or the utterance of slanderous matter only to the person defamed does not amount to publication sufficient to sustain a civil action for damages; in other words, that a communication to a third person is essential to actionable publication.

* * * * * * * *
Strictly speaking, if a communication to the agent of a person defamed is not publication, it becomes unnecessary to determine whether the communication is privileged. But, as stated in one case, the distinction between publication and privilege is not always preserved. Thus, in some cases * * * involving allegedly slanderous remarks made to plaintiff's agent in response to an inquiry by the latter, the courts have held that under the circumstances the words were not actionable, or could not be made the basis of a cause of action. The effect of such a holding is that there is no publication, but it is not expressly so stated. Moreover, the language found in other cases indicates that the word "privileged" has been considered more or less synonymous with "publication". [at 208]
In the instant case there is considerable doubt whether mere application for unemployment benefits constitutes consent to defamation. The Unemployment Compensation Commission did not, upon application by the individual plaintiffs, become their agent for the purpose of "correction of an ambiguity." It is apparent that merely by applying for unemployment compensation plaintiffs did not "invite or instigate" more than a mere statement of the reasons for separation. The public policy contained in the Unemployment Compensation Law is remedial and should not be interpreted as subjecting an applicant to the chilling effect of damage to reputation by the act of mere application. We hold, therefore, that the letters to the Unemployment Compensation Commission were published, and that no absolute privilege attached.
*153 Although N.J.S.A. 43:21-16(g) provides statutory confidentiality for information elicited thereunder, the fact that the Unemployment Compensation Commission and several other governmental agencies would, in the performance of their duties, according to testimony at trial, have access to the information provided by defendant, comports with reasonable expectations arising from the language of N.J.S.A. 43:21-11. Transmittal to such public officials would constitute publication as well.
Finally, the language of the statute contains no absolute privilege with regard to communications from employers pursuant to it. Compare Griffith v. Southwestern Bell Tel. Co., 428 F. Supp. 284 (W.D. Okl. 1976), construing an Oklahoma statute containing such an absolute privilege, 12 Okl. St. Ann. § 1441. Nor does a reasonable interpretation of the statute require absolute privilege to be imposed. The policy behind the confidentiality of information submitted to the Unemployment Compensation Commission pursuant to the statute is remedial in nature and protects the interests of both employing unit and applicant. A policy encouraging honest expressions by employers is implicit in the confidentiality language of the statute, but this policy provides, at best, qualified privilege, subject to abuse.
In Mick v. American Dental Ass'n, supra, the court stated:
The classic definition, as stated by Baron Parke, in Toogood v. Spyring, 1 C.M. & R., 181, 149 Eng. Rep. 11044, 1050 (1834), was that a communication is privileged if "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of one's own affairs in the matters where his interest is concerned." [at 278]
This definition has been restated in Jorgensen v. Pennsylvania R.R. Co., supra, to the effect that
`a communication, made bona fide, upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a *154 corresponding interest or duty, although it contain criminatory matter which, without this privilege, would be actionable.' [25 N.J. at 564]
Unlike absolute privilege, which affords complete protection, qualified privilege affords immunity only if there is no ill motive or malice in fact, and can be lost by abuse on the part of the defendant. Sokolay v. Edlin, 65 N.J. Super. 112 (App. Div. 1961) indicated:
The defendant has the burden of establishing the existence of a privileged occasion for the publication by proving a recognized public or private interest which would justify the utterance for words.... Once the existence of privilege is established, the burden is on the plaintiff to prove it abuse by excessive publication, either by use of the occasion for an improper purpose, or by lack of belief or grounds of belief in the truth of what is said. [at 124-125]
It is in the area of qualified or conditional privilege, that Gertz has its most profound effect on the law of defamation. Restatement, Torts 2d, C. 25, Topic 3, "Conditional Privileges: Title A, Occasions Making a Publication Conditionally Privileged, Special Note on Conditional Privileges and the Constitutional Requirement of Fault," states:
It is apparent that there is an inherent conflict between the constitutional fault (negligence or worse as to truth or falsity) required by Sec. 580B, and the lack of reasonable grounds for belief in truth (the equivalent of negligence as to truth or falsity) which was the basis of abuse of privilege under Sec. 601 of the First Restatement. If the Plaintiff proves the required constitutional negligence (or greater fault) in order to have a cause of action at all, he has by that very action proved that any possible conditional privilege was abused. The result is that all of the conditional privileges (Secs. 593-598-A) completely lose their significance, and the sections on abuse of conditional privilege (Secs. 599-605A) are no longer relevant.
In Krumholz v. TRW, Inc., 142 N.J. Super. 80 (App. Div. 1976) the court implicitly adopted the Restatement, § 580B, "Test of Defamation," after Gertz v. Robert Welch, Inc., in ruling on a qualified privilege:
*155 We agree with the trial judge that plaintiff failed to prove express malice on the part of defendant in publishing reports to the bank [and Gulf] "in the sense of spite, ill will or vindictiveness or a reckless disregard or conscious indifference * * * to" plaintiff's rights, and that therefore it was proper to withdraw that question from the jury.

* * * * * * * *
However, the judge erred in not submitting to the jury a disputed issue of material fact  whether there was a bona fide honest belief by defendant in the truth of the judgment against plaintiff of $2,082.61....
The jury should be instructed that there must be reasonable or a viable cause for such relief by defendant and that in one's belief and good faith and the truth of the information given may not be found if that belief is unreasonable under the circumstances. In the latter event the qualified privilege otherwise afforded defendant is overcome and is no longer available to it. [at 85]
Despite the language in Krumholz regarding spite, ill will or vindictiveness, it appears clear that Gertz and Krumholz require some degree of fault as to the truth of the matter here imposing liability. Spite, ill will or vindictiveness are, apparently, insufficient without more to impose liability. Compare Jacron Sales Co., Inc. v. Sindorf, 276 Md. 580, 350 A.2d 688 (Ct. App. 1976), and Frakt, Evolving Law of Defamation: New York Times Co. v. Sullivan to Gertz v. Robert Welch, Inc., and Beyond, 6 Rutg.  Camden L.J. 471 (1975), and Hill, "Defamation and Privacy Under the First Amendment," 76 Col. L.R. 1205 (1976).
In Jacron Sales Co., Inc. v. Sindorf, supra, the court reviewed Maryland cases on abuse of conditional privilege. Like New Jersey cases, Maryland cases on abuse of conditional privilege are couched in terms of "express malice" or "actual malice." The court concluded:
* * * The explanation in some of the earlier cases was that malice is an element of the tort of defamation, but is generally presumed in the publication of defamatory matter unless a privilege is established, in which event the presumption is rebutted and malice must be proved. * * * Malice was variously defined in the cases as a lack of good faith, ill-will, hostility, or hatred. * * * Excessive publication and unnecessarily abusive language were held to be evidence of malice. * * *
*156 Express or actual malice represents something more than conduct that is merely negligent. In Deckelman v. Blake, supra [149 Md. 533, 131 A. 762 (1962)], the Court, quoting from 17 R.C.L. 321 defined malice as "`wanton disposition grossly negligent of the rights of others.'" Speaking generally in Fresh v. Cutter, supra 73 Md. at 92, 20 A. at 775 (1890), the court defined malice as "knowingly stat[ing] what was untrue and injurious," but more specifically in Stevenson v. Baltimore Club, 250 Md. 482, 243 A.2d 533 (1968), we defined malice in part as the reckless disregard of truth:
The privilege may be lost, however, if the plaintiff in a defamation case can show malice, which in this context means not hatred nor spite but rather a reckless disregard of truth, the use of unnecessarily abusive language, or other circumstances which would support a conclusion that defendant acted in ill-tempered manner or was motivated by ill will. 250 Md. at 486-87, 243 A.2d at 536 (emphasis added).
We repeated the Stevenson definition in Orrison v. Vance, 262 Md. 285, 295, 277 A.2d 573 (1971), and thus the reckless disregard standard now appears to be firmly established in Maryland as a test, albeit not the exclusive test, of abuse of a conditional privilege. This being a higher standard than negligence, we retain the common law additional privilege in Maryland which, in a given case, may suffice to avoid liability even though the Gertz standard regarding falsity and defamation is met by the plaintiff. * * * [350 A.2d at 699]
Thus, the highest court of a sister state has found the standard of express malice to be in conformity with the requirements of Gertz v. Robert Welch, Inc., supra. In light of Krumholz, supra, we conclude that a New Jersey standard of express malice similarly conforms to Gertz v. Robert Welch, Inc. and therefore conclude that New Jersey should retain common-law conditional privilege.
The letters sent to the Unemployment Compensation Commission were conditionally privileged. Defendant was under a duty pursuant to the New Jersey Administrative Code to respond within seven days to the request for separation information. This cast upon him a duty of making the communication to the Unemployment Compensation Commission, and the letters were sent in performance to that duty. Furthermore, defendant was so situated that it became right in the interests of society that he should tell the Unemployment *157 Compensation Commission certain facts which he in good faith may have proceeded to do. Having found a qualified privilege, plaintiff then had the burden of proving that abuse by excessive publication, either by the use of the occasion for the improper purpose, or by lack of reasonable grounds for belief in the truth of what was said. In Murphy v. Johns-Manville Products Corp. supra, the court said:
There was no proof forthcoming to show that the publication which was entirely within the defendant corporation and the union group, exceeded the grounds of its qualified privilege. It is entirely clear to us that all of the people to whom copies of the minutes were sent had a sufficient interest in the matter, from the standpoint of the company and union management relations, as to make the communication not only qualifiedly privileged, but its distribution well within reason, as a matter of law. [45 N.J. Super. at 493]
Similarly, here there was no proof forthcoming to show that publication, previously found, entirely within the Unemployment Compensation Commission or authorized state agencies, which was previously found, exceeded the bounds of the qualified privilege. Both statements were made with, at most, a negligent disregard of truth. The letter as to Ginger Rogozinski was based upon incomplete sales information. No improper purpose or excessive publication having been shown, the standard of express malice has not been met to overcome defendant's qualified privilege.
Similarly, as to Andrew Rogozinski, although the record is replete evidence of ill will and vindictiveness on both sides in their business dealings, the letter itself was qualifiedly privileged and no more than negligence as to the slight implication of criminality has been shown. Defendant did not abuse his qualified privilege in explaining Andrew Rogozinski's discharge.
Having found that the letters forming the basis for the two counts of defamation were privileged, no damages will be assessed against defendant on counts 2 and 3.
As to breach of the employment contract, plaintiff Andrew Rogozinski proved $641 still owing on the contract prior to *158 his September 2, 1975 discharge, and a subsequent loss of $320 a week as a draw from Airstreams by Angell, Inc. Plaintiff indicated that either this draw or body shop commission on parts and labor may have increased during subsequent years.
The general rule for damages upon breach of contract is
* * * subject to two qualifications designed to confine within reasonable limits the appraisement of the consequences of default; (1) the damages are those arising naturally according to the usual course of things from the breach of contract, or such as may fairly and reasonably be supposed to have been in the contemplation of the parties to the contract at the time it was made, as a probable result of the breach; and (2) there must be reasonably certain and definite consequences of the breach as distinguished from the mere quantitative uncertainty. [Tessmar v. Grosner, 23 N.J. 193, 203 (1957)]
In this case the possibility of increase in draw or commissions is simply too speculative to meet even these qualifications. Andrew Rogozinski functioned as body shop manager under the second contract for too short a period to determine what changes in compensation might fulfill the reasonable expectations of the parties. The body shop was, by all accounts, a risky endeavour. Andrew Rogozinski's subsequent compensation at $250 a week, commencing April 10, 1975, could also reasonably have been expected to change, but the amount of such change is subject to mere speculation. This court finds, therefore, that $320 a week is the reasonably foreseeable rate of compensation under the contract for the two-year period of damages. From this sum will be deducted the compensation at $250 a week obtained through subsequent employment from April 10, 1976 through September 2, 1977. Andrew Rogozinski's total recovery for lost earnings is, therefore, $15,921.
Travel expenses of $3,190 and motel expenses of $568.97 were proven at trial and were reasonably foreseeable consequences of plaintiff's wrongful discharge.
*159 Judgment will, therefore, be entered in favor of plaintiff Andrew Rogozinski in the amount of $20,697.97. This amount will be deposited into court by August 8, 1977. This recovery is subject to taxation, and plaintiff will provide proof of notification of this award to applicable federal and state taxation authorities and to the Unemployment Compensation Commission prior to any release of the deposited funds.
Costs are to be taxed by the clerk of the court as allowable by law. Interest should be allowed from the date of discharge, September 3, 1975.
NOTES
[1] By administrative determination, the letters did not result in denial of unemployment benefits to either plaintiff.
[2] N.J.S.A. 43:21-16(b) contains two paragraphs. The second, unnumbered paragraph imposes $500 penalties for each report and for each seven-day period of delayed submission.
[3] Compare Prosser, Law of Torts (4 ed. 1971), § 115, "Qualified Privilege, 4. Communications to One Who May Act in the Public Interest":

The first, sometimes called the public interest privilege, involves communications made to those who may be expected to take official action of some kind for the protection of some interest of the public. It is on this basis that communications from one public officer to another, in an effort to discharge official duty, are held to be at least qualifiedly privileged, even where no absolute privilege is found. But private citizens likewise are privileged to give information to proper authorities for the prevention or detection of crime, or to complain to them about the conduct of public officials and seek their removal from office.